GARTON TOY COMPANY, Respondent, vs. BUSWELL LUMBER & MANUFACTURING COMPANY, Appellant.

*April 25—October 8, 1912.*

*Statute of frauds: Signature to contract: Typewritten name of corporation: Part performance: Delivery pursuant to contract: Sales: Contract: Construction: Breach by vendor: Failure by vendee to pay for part delivered: Measure of damages: Instructions to jury: Evidence: Competency: Expert testimony: Appeal: Harmless errors.*

1. A typewritten signature of the name of the vendee corporation to an order for merchandise is sufficient under the statute of frauds to bind such corporation.
2. Although such an order was not signed or accepted in writing by the vendor, a delivery of part of the goods ordered, pursuant thereto, was sufficient part performance to take the case out of the statute.
3. A letter written in reply to a request for deliveries of lumber on plaintiff's previous order, stating that defendant had advised its mill to ship one car at once, then stating that the contract was indefinite as to date of completion, and suggesting a mutual understanding allowing defendant four or five months' time in which to fill the order, is construed as showing such shipment to have been in unqualified compliance with the contract, thereby tolling the statute.
4. Failure to pay for one car of lumber shipped in part performance of a contract of sale, where nothing was due under sixty days, by which time the seller had breached its contract and it was apparent that the buyer would suffer a considerable loss in consequence, would not bar recovery by the latter in an action for damages for such breach.
5. An order by a manufacturer of croquet balls and toys for "100 M ft. of 4 x 4 maple to be cut a little wane or heart on corners so that it will turn off. And 65 M ft. of 2½ inch plank cut so as to be No. 2 and better, with sound hearts," could not be filled by the vendor by shipment of No. 2 and better lumber, unless it was free from heart or wane except a little on the corners that could be turned off; and a requested instruction that he was entitled to determine and select the grades of lumber provided none was lower than No. 2 common, was properly refused.
6. A requested instruction that under such order the vendor was entitled to deliver No. 2 common or No. 1 common according

to the rules of the National Hardwood Association, "without, however, considering wane or heart on corners as a defect," was also incorrect.

7. The vendor having failed to deliver a large part of the lumber ordered, and the vendee having been unable to find maple 4 x 4's in the market and having been obliged to purchase four-inch planks of greater width and resaw them with considerable waste, the question as to what quantity of such planks of the kinds and grades purchased would be required to make as many croquet balls as could be made from the 4 x 4's contracted for and not delivered, was a proper subject for expert testimony.

8. To show the difference between a straight grade of No. 2 common and better and No. 2 common and better from which was excluded all pieces of lumber which had either wane or heart that would not turn off in the process of manufacturing croquet balls, and to justify the purchase by the vendee of a large proportion of lumber of higher grade than No. 2 common, a witness on behalf of the vendee was properly allowed to testify that the 4 x 4's ordered would make a grade of No. 1 common and better lumber, and as to the proportion of higher grades which would be included in the "No. 2 common and better" called for by the contract.

9. Upon the question of damages for the vendor's breach of the contract, the vendee should not be concluded by a statement in its bill of particulars that there was a waste of "at least 12,642 feet" in resawing planks purchased to fill out the contract, especially where it appeared that such figures were the result of a mere estimate.

10. Inaccuracy in the form of a question put to a witness is not a prejudicial error where it is apparent that the witness understood and answered it in the proper sense.

11. Computation of damages upon an incorrect basis is not a material error if the result is as favorable to the appellant as the result of a proper computation would have been.

APPEAL from a judgment of the circuit court for Sheboygan county: MICHAEL KIRWAN, Circuit Judge. *Affirmed.*

The plaintiff is engaged in the business of manufacturing croquet balls, toys, and novelties at Sheboygan, Wisconsin. The defendant is engaged in the manufacture of lumber. On or about January 5, 1907, the president of the defendant corporation called upon the plaintiff at its office in Sheboygan and solicited an order for the purchase of some lumber. An

agreement was reached, which was evidenced by the follow-
ing memorandum signed in typewriting by the plaintiff, but
not signed by the defendant:

                        "Sheboygan, Wis., Jan. 5, 1907.
"*Buswell Lumber & Mfg. Co.*,
            "Minneapolis, Minn.
    "Please enter our order for 100 M ft. of 4 x 4 Maple to
be cut a little wane or heart on corners so that it will turn
off.   And 65 M ft. of 2½ inch Plank cut so as to be No. 2
and better with sound hearts, boxed or otherwise at $23
per M. f. o. b. Sheboygan.   To be sawed this winter or early
spring; shipped when in shipping condition.
    "Terms net 60 days or 2 % off for cash in 15 days from
date of shipment.                    GARTON TOY CO."

    One copy of this instrument was delivered to the defend-
ant's representative and one was retained by the plaintiff.
There is evidence tending to show that at the time of the mak-
ing of this contract the defendant understood that the 4 x 4
lumber mentioned in the memorandum was to be used in the
manufacture of croquet balls, and that plaintiff could not use
material that had wane or heart that would not be eliminated
in the process of manufacture.   On September 25, 1907, the
plaintiff wrote the defendant as follows:

    "Please ship us immediately all of the 4 x 4 maple you
have cut, as we want to get it piled more open so it will dry
faster."

    The defendant sent the following answer to this letter:

"*Messrs. Garton Toy Co.*,                    Sept. 27, 1907.
            "Sheboygan, Wis.
    "DEAR SIRS: We are in receipt of your favor of the 25th
inst., in which you ask us to begin shipments on your maple,
and we have advised our mill to ship you one car at once,
and will arrange to ship you more as we accumulate the stock
from time to time that is in fair shipping condition.
    "Desire to say with reference to your contract, we find
there is no specified date for completion of the contract and
advise you, therefore, that owing to the fact that we have

been able to run our mill only one shift, on account of shortage of labor, we have not been able to produce as much on the contract as we had expected to do, and it looks now as though it would take us several months to complete your contract. We expect to be able to give you all that is called for on the contract, but it will take us, as stated, a longer time than the writer had anticipated.

"The writer desires very much to have a mutual understanding so that we can lay our plans to mutual advantage. I should say that it will take us four or five months, at least, to get out your orders unless we are able to run our mill a double shift.

"Kindly let us hear from you if you have any suggestions to offer as to the delivery of the stock.

"Respectfully yours,

"BUSWELL LBR. & MFG. CO.
"F. W. Buswell."

Under date of October 4th the defendant invoiced a carload of lumber to the plaintiff, which contained 9,598 feet in the aggregate, of which amount 2,080 feet was 4 x 4 lumber.   On October 8, 1907, plaintiff acknowledged receipt of the invoice and stated:

"According to our contract this maple was to have been sawed last winter or early last spring, and shipped when in shipping condition.   Accordingly the lumber should all of it be in perfect shipping condition at the present time, and we certainly must have all of it in our yard before the first of January, or it will very seriously cripple our croquet business.   Please advise us by return mail just how much of this stock you have ready to ship now."

A number of letters passed between the parties between this date and December 9th.   In the letters written by the plaintiff it insisted that the 4 x 4 should have been manufactured during the winter and early spring and that defendant should fulfil its contract.   On the part of the defendant it was stated that it was disappointed in not being able to run its mill night and day, and reference was made to the small

amount of maple logs which it had, and, while generally expressing a willingness to supply the lumber contracted for, it stated that it could not do so for a very considerable period of time. The defendant was informed that unless it furnished the lumber plaintiff would be obliged to go into the open market and buy other lumber to take its place and would hold the defendant responsible for the difference in price. On December 7th the plaintiff refused to pay for the carload of lumber delivered because the defendant had breached its contract. On December 9th the defendant wrote plaintiff as follows:

"We have been sawing on your order and have some of the stock on hand, but will be compelled to cease sawing on your contract unless you will agree to promptly pay for the car which we have shipped you and which is now past due, and waive all claim for damages on account of alleged delay in making shipments. If you accept our terms we will make an especial effort to get the stock out for you; if not, we will be compelled by your action to cancel contract and proceed to collect for the car which is now shipped and past due."

This letter ended the correspondence between the parties. The plaintiff purchased other lumber on the market from time to time to take the place of that contracted for, to the amount of 110,380 feet. It was unable to secure maple of the desired quality sawed into 4 x 4 dimensions, so it was obliged to take dimensions wider than four inches, upon which there was considerable waste. Plaintiff brought this action to recover the damages which it sustained by reason of the breach of the contract. The defendant denied liability and counterclaimed for the purchase price of the carload of lumber shipped. The jury returned the following special verdict:

"(1) During all of the period which constituted a reasonable time for the delivery of the lumber described in the contract in suit which was made by plaintiff with defendant, was

plaintiff ready and willing to receive all of that lumber under the contract?  *A.* Yes.

"(2) If the answer to the first question be 'Yes,' then answer this: Did defendant fail to furnish to plaintiff within such reasonable time the 4 x 4 inch maple lumber, or so-called 'squares' mentioned in the contract, excepting only 2,000 feet thereof?  *A.* Yes.

"(3) If the answer to the second question be 'Yes,' then answer this: Because of such failure on defendant's part, and in order that plaintiff might be able to carry on its business of manufacturing croquet balls, was plaintiff compelled to purchase in the market other lumber to take the place of the four-inch lumber which defendant agreed to furnish to plaintiff under said contract?  *A.* Yes.

"(4) If the answer to the third question be 'Yes,' then answer this: At the times when plaintiff purchased four-inch planks to take the place of the 'squares' which defendant failed to furnish, what was the market value per thousand feet, delivered on board cars at Sheboygan, Wisconsin, freight charges prepaid by the seller, of four-inch planks corresponding as nearly to, and not falling below the requirement of the contract in suit as to the quality or grade of 4 x 4 inch lumber to be delivered thereunder as by reasonable effort could then be purchased in the market, and which was suitable for the manufacture therefrom of croquet balls?  *A.* 30 76/100 dollars per thousand feet.

"(5) What quantity of the planks described in the fourth question would be required for the purpose of manufacturing therefrom substantially the same number of croquet balls as could be made from 98,000 feet of the maple squares which defendant agreed to furnish under the contract?  *A.* 130,660 feet.

"(6) What would be the quantity and market value of the waste material resulting from manufacturing into squares the quantity of the planks specified in your answer to the fifth question?  *A.* 32,660 feet of waste at $15 per thousand feet, of a total value of $489.90.

"(7) What would be the reasonable value of sawing into the so-called four-inch by four-inch squares the quantity of the planks specified in your answer to the fifth question?  *A.* $2 per thousand feet.

"(8) Could plaintiff, by the exercise of reasonable effort and diligence, have purchased in the market in the fall of 1907 and the winter and spring of 1908 four-inch by four-inch maple squares suitable then for the manufacture therefrom of croquet balls ?  *A.*  Yes.

"(9) If the answer to the eighth question be 'Yes,' then answer this: At that time, what quantity not exceeding 98,000 feet, and what grade or grades of such squares, could plaintiff have so found for sale in the market ?  *A.*  14,880 feet, of the grade of first and second clear.

"(10) What quantity of such squares, of the grade or grades specified in your answer to the ninth question, would be required for the purpose of manufacturing therefrom substantially the same number of croquet balls as could be made from 98,000 feet of the maple squares which defendant agreed to furnish under the contract ?  *A.*  98,000 feet.

"(11) At the time stated in the eighth question, what was the market value per thousand feet, delivered on board of cars at Sheboygan, Wis., freight charges prepaid by the seller, of four-inch by four-inch maple squares of the grade or grades specified in your answer to the ninth question ?  *A.*  Forty-three dollars per thousand feet."

Upon this verdict judgment was entered in favor of the plaintiff, from which judgment defendant appeals.

For the appellant there was a brief by *Richmond, Jackman & Swansen,* and oral argument by *S. T. Swansen.*  Upon the statute of frauds they cited, among other cases, *James v. Patten,* 6 N. Y. 9; *Davis v. Shields,* 26 Wend. 341; *Miller v. Pelletier,* 4 Edw. Ch. 102; *Bush v. McFarland,* 94 Tenn. 538, 29 S. W. 899, 27 L. R. A. 662; *Hodson v. Carter,* 3 Pin. 212; *Wiener v. Whipple,* 53 Wis. 298, 10 N. W. 433; *Clason's Ex'rs v. Bailey,* 14 Johns. 484; *Baker v. Calmenson,* 102 Minn. 406, 113 N. W. 1014; *Old Colony R. Corp. v. Evans,* 72 Mass. 25; *Brown v. Snider,* 126 Mich. 198, 85 N. W. 570; *Somers v. McLaughlin,* 57 Wis. 358, 15 N. W. 442; *Spear v. Bach,* 82 Wis. 192, 52 N. W. 97; *Koch v. Williams,* 82 Wis. 186, 52 N. W. 257; *Wardell v. Williams,* 62 Mich. 50, 28 N. W. 796.

For the respondent there was a brief by *Bowler & Bowler,* and oral argument by *E. R. Bowler.*

The following opinion was filed May 14, 1912:

BARNES, J.    The defendant contends that the order for the lumber was never subscribed by the plaintiff as required by sec. 2308, Stats. (1898), because it was signed in typewriting and hence was void under the statute of frauds. The question is not material because of reasons hereinafter stated, but if it were, the signature is sufficient to meet the calls of the statute. *Mezchen v. More,* 54 Wis. 214, 11 N. W. 534; *Dreutzer v. Smith,* 56 Wis. 292, 14 N. W. 465; *Finlay v. Prescott,* 104 Wis. 614, 618, 80 N. W. 530; subd. 19, sec. 4971, Stats. (1898); sec. 4192, Stats. (1898); *Cummings v. Landes,* 140 Iowa, 80, 83, 117 N. W. 22; *Herrick v. Morrill,* 37 Minn. 250, 33 N. W. 849.

But it is argued that the contract is void under the statute of frauds because it was not signed by the defendant. On October 4, 1907, the defendant shipped a carload of lumber to plaintiff under this contract and plaintiff accepted and received the same. This was a sufficient part performance to take the case out of the statute. *Amson v. Dreher,* 35 Wis. 615; *Gano v. C. & N. W. R. Co.* 66 Wis. 1, 27 N. W. 628, 838; *Mason v. H. Whitbeck Co.* 35 Wis. 164; *Schmidt v. Thomas,* 75 Wis. 529, 44 N. W. 771; *Prairie Grove C. Mfg. Co. v. Luder,* 115 Wis. 20, 89 N. W. 138, 90 N. W. 1085; *Merriman v. McCormick H. M. Co.* 96 Wis. 600, 71 N. W. 1050; *J. H. Silkman L. Co. v. Hunholz,* 132 Wis. 610, 112 N. W. 1081.

The defendant concedes the correctness of the legal proposition, but contends that under its letter of September 27th the carload of lumber which defendant delivered was not shipped by virtue of the written order, but, at best, under a proposed modification of such order, which if accepted would extend the time of delivery for five months from the date of the letter. We do not so construe it. At the time it was

written the defendant undoubtedly supposed that it was under a valid and binding obligation to furnish the lumber under the terms of the written order. The letter stated that one carload of lumber would be shipped at once pursuant to request contained in plaintiff's letter of September 25th. It then went on to state that the contract was indefinite as to the time of delivery and gave some excuses for not having more of the stock sawed and suggested that an arrangement be made for extending the contract period of delivery. We agree with the trial court that the carload of lumber was shipped in unqualified compliance with the contract, and that the rest of the letter is an apology for not being able to ship promptly, and a plea for an extension of time.

Defendant next contends that there can be no recovery because plaintiff refused to pay for the carload of lumber which was shipped to it. This position is not tenable. There was nothing due on the purchase until the expiration of sixty days from the date of the invoice. By that time the defendant had already breached its contract and it was apparent that the plaintiff would suffer considerable loss in consequence of such breach. Furthermore, the case would seem to fall within the principle of *Campbell & C. Co. v. Weisse,* 121 Wis. 491, 99 N. W. 340, but it is unnecessary to pass on that question.

The appellant urges that the court erred in refusing to give the following instruction:

"The court instructs you that this order only calls for 'No. 2 common and better.' Under the law the defendant was entitled to determine and select the grades of lumber to fill this order, and the amount of lumber in each grade to be delivered, except that no lumber could be delivered that would grade lower than No. 2 common, and the material delivered would have to contain some lumber of a higher grade than No. 2 common."

We think the instruction was incorrect as a matter of law, and would be irrelevant if it were correct in the abstract. As we read the order, the defendant did not have the right to

fill it by shipping No. 2 common and better lumber, unless it was free from heart or wane except a little on the corners that would turn off in the process of manufacture. It is true the court did not hold as a matter of law that this was the correct construction of the order, as it might well have done. It conceived that the order was ambiguous and allowed the jury to ascertain its meaning. This ruling was favorable to the defendant, and it would have been error had the court placed the construction contended for by the defendant on the order. Whatever right the defendant might have had to select the lumber which it agreed to ship, it did not see fit to avail itself of that right, but compelled the plaintiff to procure its stock elsewhere at an inopportune time, and we are only concerned with the question whether a fair and judicious selection was made. This question will be alluded to later. Furthermore, we entertain serious doubt about the right of the defendant to fill this order with practically all No. 2 stock, putting in enough of the higher grades to make a mixture. It is unnecessary to discuss the question.

It is urged that the court also erred in refusing the following instruction:

"The court further instructs you that in this order the defendant was by law entitled to deliver, as No. 2 common, all lumber that would cut fifty per cent. clear, and as No. 1 common all lumber that would cut two thirds clear, under the rules of inspection adopted by the National Hardwood Association, without, however, considering wane or hearts on corners as a defect."

This instruction was immaterial to the issues on trial. It was also incorrect. Under it a 4 x 4 which graded above No. 3 common would have to be taken by the plaintiff if it contained wane that could not be turned off in the process of manufacturing croquet balls, and likewise a piece of lumber that had heart near the middle of it, although it might be wholly worthless for the purpose for which it was purchased.

Error is assigned because the witness Garton was permitted to testify that the 4 x 4's ordered would make a grade of No. 1 common and better lumber and that the No. 2 common and better called for by the contract would mean "about 5 % No. 2 common, 45 % No. 1, and 45 % firsts and seconds."

This testimony was offered to show the difference between a straight grade of No. 2 common and better and No. 2 common and better from which was excluded all pieces of lumber which had either wane or heart that would not turn off in the process of manufacturing croquet balls. If true, it showed that very little No. 2 common would come up to the specifications of the contract, and would justify plaintiff in buying a small amount of No. 2 common in the market. There was variance in the testimony as to the percentage of No. 2 common that would ordinarily be found in a log run of No. 2 common and better, running from thirty-three and one-third per cent. to seventy-five per cent. The plaintiff purchased only about eighteen per cent. of No. 2 common, and it was proper enough for it to show why such a large proportion of high-grade lumber was purchased. Under Mr. Garton's evidence it is more difficult to find justification for buying so much No. 2 than for buying so little. It is very evident that if a large percentage of No. 2 common, as ordinarily cut, would have heart and wane defects that would not work out in the process of manufacturing the balls as required by the contract, no economy would result from buying this kind of lumber.

The plaintiff, not being able to get dry 4 x 4's of the required quality in the market, was compelled to buy wider dimensions and resaw them. This process necessarily resulted in a large amount of waste material and in considerable expense to cover the cost of resawing. The witnesses Garton and Shufflebottom were each asked: "What quantity of four-inch planks corresponding nearly to and not falling below the quality of grade No. 2 common and better would be

required for the purpose of manufacturing therefrom substantially the same number of croquet balls as would be made from 98,000 feet of maple squares called for under the contract?" The question was objected to by defendant in each instance and each witness was permitted to answer. Garton said you would have to add from twenty-five to thirty-three and one-third per cent. to the 98,000 feet, and Shufflebottom said it would require 130,000 feet. The fault found with the question is that neither of the parties had sufficient experience to qualify him to testify and that the witnesses were permitted to assume that the contract meant anything they wished. The subject was a proper one for expert evidence and we think the witnesses were competent. The other objection is not well taken because the question is in the abstract and makes no reference to the contract. We think the question was faulty in one respect. The evidence showed that plaintiff had purchased 110,382 feet of lumber, some of which graded first and second clear, some No. 1 common and some No. 2 common, and the quantity of each was established by the evidence. The inquiry should have been as to the number of feet of lumber of the kinds and grades purchased it would take to make as many croquet balls as could be made from 98,000 feet of the kind of lumber called for by the contract. We think it is quite apparent that the witnesses so understood the question, and that although it was not strictly accurate in form no prejudice resulted.

Lastly it is contended that the damages are excessive. The court computed damages on the verdict as follows: 130,660 feet at $30.76 per thousand, $4,019.10; cost of resawing, $261.32; total, $4,280.42. From this was deducted for value of waste material, $489.90, and the cost of 98,000 feet at the contract price of $23, $2,254. Total deductions, $2,743.90, leaving $1,536.52 damages. From this amount the court made a further deduction of $136.52, because the

complaint only claimed damages in the sum of $1,400, after eliminating one item of damage therein claimed which was abandoned on the trial. In view of the evidence in the case the defendant might well insist on a different basis of computation as to so much of the shortage on its contract as was not made up by the purchase of the 110,382 feet of lumber which the plaintiff actually bought. It was shown that there was 4 x 4 lumber on the market which plaintiff might have purchased had it been aware of that fact. In view of the deduction of $136.52 made by the court, the result reached was as favorable to the defendant as the result of the computation which we have in mind would be, and the error therefore, if there is any, is immaterial.

The appellant contends that damages should have been assessed upon the theory that the 110,382 feet of lumber purchased produced as many croquet balls as the 98,000 feet would have produced, which the defendant agreed to furnish but did not furnish, and that damages should be assessed on this basis. The claim is based on a statement in the bill of particulars furnished by plaintiff, which recited that there was a waste of at least 12,462 feet in resawing the 110,382 feet of lumber purchased and used, and on a computation of damages made on this assumption. The plaintiff did not assume to know the exact amount of waste that would result from cutting up the lumber purchased, and the figures given represented an estimate somewhat guardedly made. The plaintiff does not say that the waste would be 12,462 feet, but that it would be at least that much. The actual amount of waste was something that it was difficult to determine with mathematical certainty, unless the plaintiff kept track of every board as it went through its factory, and this it did not do. The matter of determining the amount of waste was submitted to the jury without objection and it reached a conclusion that is sustained by the evidence. We do not think

the plaintiff should be concluded by the somewhat equivocal statement contained in its bill of particulars, particularly when it appears that the figures were the result of a mere estimate.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied October 8, 1912.