SHEFFIELD-KING MILLING COMPANY, Respondent, vs.
JACOBS, Appellant.

*November 5, 1919—January 13, 1920.*

*Damages: Contract of sale: Breach by purchaser: Stipulated
damages: Expressed intent of parties: Relation to actual
damages: Difficulty of ascertaining damages: Relief from
harsh or burdensome contracts: Validity determined as of
date of execution: Gaming contracts: Market price of wheat
as basis of damages: Pleading: Liberal construction on ap-
peal: Evidence: Judicial notice of grades of wheat.*

1. On appeal, an allegation of the answer in an action on con-
   tract that plaintiff suffered no damage will be liberally con-
   strued, as being equivalent to an allegation that the agreed
   measure of damages was unreasonable, and therefore as pre-
   senting the question whether the agreed damages are liqui-
   dated damages or a penalty, the case being presented on that
   theory and no other question being argued.
2. One asking relief from a contract freely entered into, in the
   absence of fraud or overreaching, does not bring himself
   within the field of judicial relief by merely showing that the
   result of the contract is harsh and burdensome.
3. Stipulated damages must appear to be grossly in excess of the
   actual damages, or have no relation thereto, before the court
   can say that the damages stipulated are a penalty.
4. The rule that in determining whether an amount agreed upon
   as damages was intended as liquidated damages or a penalty
   the expressed intention of the parties gives way to the equity
   of the particular case, applies only where damages are readily
   computable and where the agreed damages are largely in
   excess of the actual damages.
5. Courts are now strongly inclined to allow parties to make their
   own contracts and to carry out their intentions, even where
   it would result in the recovery of an amount stated as liqui-
   dated damages, upon proof of violation of the contract, and
   without proof of the damages actually sustained.
6. Judicial notice may be taken of the fact that No. 1 Northern
   wheat is one of the standard grades and that the prices of
   other grades have a direct, although perhaps a varying, rela-
   tion to it.
7. In a seller's action for the breach of a contract for the sale of
   flour to be manufactured, a complaint which, while not alleg-
   ing that plaintiff had purchased any particular lot of wheat
   for the manufacture of the flour, did allege that plaintiff was

ready, able, and willing to perform, must be taken to mean that plaintiff had on hand the raw materials out of which the flour was to be manufactured.

8. The validity of a contract is to be determined as of the date of its execution, and a contract valid when made cannot be rendered invalid even by legislative action.

9. In a contract for the sale of flour to be manufactured, made one month after the declaration of war by the United States against Germany, a provision for liquidated damages for the buyer's breach, while allowing recovery of large damages, apparently grossly disproportionate to the actual damages, is valid, in view of the uncertainty of the market and the difficulty of fixing the actual damages.

10. The fact that a provision for liquidated damages for the buyer's breach of contract for sale of flour to be manufactured was based on the market price of No. 1 Northern wheat at a named exchange, did not render the sale contract void as a gaming contract, in the absence of a showing that the parties did not intend to carry out the contract.

ESCHWEILER, J., dissents.

APPEAL from a judgment of the circuit court for Dodge county: MARTIN L. LUECK, Circuit Judge. *Affirmed.*

Contract. From the complaint it appears that the plaintiff is a Minnesota corporation located at the city of Minneapolis, and manufacturer and marketer of a certain grade and quality of flour known as "Gold Mine;" that on the 7th day of May, 1917, the defendant, a dealer residing at the city of Waupun, by written contract purchased 205 barrels of Gold Mine flour, 196 pounds to the barrel, which was packed in cotton bags each containing forty-nine pounds, and agreed to pay for the same at the rate of $12.10 per barrel. Said contract was duly executed by the parties, and the parts material here are as follows:

"Dated Waupun, Wisconsin, May 7, 1917.

"*Sheffield-King Milling Co.,* of Minneapolis, Minn., agrees to sell to *F. S. Jacobs,* of Waupun, Wisconsin, who agrees to purchase from seller at Faribault, Minn., at the price, on the terms and conditions, and subject to the agreements stated below and *on the back hereof,* the following goods:

"Number of barrels of flour, 205.

"Style of package, 49 lb. cotton.

"Brand, 'Gold Mine' flour.

"Price of flour per barrel, $12.10.

"Subject to confirmation of *Sheffield-King Mlg. Co.*

"Ship to Waupun, Wisconsin.

"Railroad delivery requested by buyer, C., M. & St. P.

"On directions to be furnished by buyer, shipment is to
be made by seller after September 15th and before January
1, 1918.

"Terms: Net.   Arrival draft with bill of lading attached.

"State Bank of Waupun, Wisconsin.

"Freight allowed to Waupun, Wisconsin."

(Paragraph relating to shipping directions, not material.)

"Par. 2. Buyer's failure or refusal to so furnish such
directions on or before shipping date above, or within any
extended period, if any, shall give seller right, as to any
flour and also as to any feed, if any, remaining unshipped
by reason of such failure or refusal, to either (a) treat con-
tract as if rescinded without damages to either party; or
(b) extend shipping date above, or extended period, if any,
30 days, and thereafter (as long as buyer fails or refuses
to furnish such directions) continue the life of this contract
by as many such successive extensions as seller may desire,
all subject to hereinafter mentioned carrying charges
against buyer; or (c) ship such goods to buyer within 30
days after shipping date above, or expiration of last ex-
tended period, exercising its judgment as to packages de-
sired by buyer; or (d) treat contract as broken and (as to
such unshipped goods only) terminate contract at 5 o'clock
p. m. Central time, on shipping date above, or, if said date
has been extended, then on last day of last extended period,
and, as to such unshipped flour, recover from buyer (less
any sum, if any, paid by way of carrying charges on such
unshipped flour only) a sum to be calculated as follows:
the difference between highest closing price, at Minneapolis,
of No. 1 Northern (cash) wheat (delivered) on date this
contract bears and highest closing price, at Mpls., of No. 1
Northern (cash) wheat (delivered) on date of such ter-
mination (if latter price be less than former) multiplied by
the number of bushels of wheat required to manufacture
such unshipped flour, figuring 4½ bu. to the bbl., plus a
sum equal to 1c. multiplied by the number of bu. aforesaid
(to be calculated for each 30 days, or fraction thereof, in-

tervening between date of this contract and date of such termination), plus, also, a sum equal to 4c. multiplied by the number of bu. aforesaid. And, if such price of such wheat on date of such termination is greater than price on date of this contract, seller's recovery shall be said 1c. per bu. for each 30 days, or fraction thereof, aforesaid, and said 4c. per bu. aforesaid, less such carrying charges paid, and less the difference between said two wheat prices, on the number of bu. aforesaid."

"Par. 9. If buyer prior to shipping date above (within) or expiration of any extended period, if any, repudiates any of his obligations hereunder, or requests or explicitly directs seller to cancel this contract, or otherwise expresses an intention not to carry out his part hereof, seller may, as to goods shipped and refused by buyer, recover damages as set out in par. 3 within; and, as to any and all goods unshipped under this contract, seller may exercise any one of the following rights: (e) treat entire contract as if immediately rescinded without damages to either party; or (f) treat such conduct as a breach of contract and immediately terminate this entire contract and recover from buyer, as to any and all goods unshipped under this contract, damages calculated in the same mode set out in sub. d of par. 2 within, with the qualification that, in such instance, dates for determination of prices shall be date this contract bears and date of termination of this entire contract under the provisions of this par. 9, and that said mode of calculation shall be applied, in such instance, to, and damages shall be calculated on, any and all goods unshipped under this contract, and not merely such goods as remain unshipped by reason of buyer's failure or refusal to furnish directions for the shipment thereof, and that carrying charges to be deducted shall be any and all carrying charges paid, if any, on any and all flour unshipped under this contract; or (g) seller may entirely disregard such conduct and breach on buyer's part and exercise any one of the rights given it in par. 2 within except that mentioned in sub. b thereof. In case seller elects under either sub e or f of this par., it shall immediately, on so electing, mail buyer notice of such election, and, failing to notify buyer, seller shall be deemed to have elected under sub. g of this paragraph. Seller may elect under either sub. e or f of this par. any time within 10 days after it has become aware of conduct of buyer in this par. referred to."

"Par. 10. In explanation of measure of damages set out in sub. d of par. 2 within; wheat prices therein shall refer to wheat actually in Mpls. at times therein indicated, such wheat being what is known at chamber of commerce, Mpls., as spot or cash wheat delivered, such closing prices being fixed daily (except Sundays and holidays) by said chamber of commerce.    Such closing prices as shown by 'Daily Market Record' of Mpls. shall be conclusive unless proven materially erroneous.    'No. 1 Northern' shall refer to a certain grade of wheat commonly known by that name in said chamber of commerce and fixed from time to time in Minnesota.    In case of seller's election under said sub. d the said 1c. per bu. and 4c. per bu. become fixed debits against buyer, carrying charges paid a fixed credit in his favor and difference in wheat prices is debited against him in case of a decline, and credited to him in case of a rise in price of wheat, such decline or rise being determined by multiplying the difference in prices of wheat on dates mentioned by the number of bushels mentioned.    Under sub. f of par. 9 this mode of calculation is applied to all flour unshipped under this contract, even though there may be flour on which shipping directions are not due.    Par. 2 within shall apply only to flour and also feed, if any (both or either), remaining unshipped by reason of buyer's failure or refusal to furnish shipping directions in accordance with par. 1, except that the mode of calculation set out in said sub. d shall apply, as above, under said sub. f.    Sum allowed seller in said sub. d is on account of decline in price of wheat, if any, and such other damage, expense, and loss as may result by reason of buyer's default.    Nothing herein shall require sum in said sub. d set out.    In fixing damages as seller to prove any actual loss in order to recover in said sub. d, the desire is to agree upon a certain mode of calculation, since seller's actual loss cannot be predetermined, would be difficult of ascertainment and a matter of argument, and said mode is an equitable general rule for measurement of seller's prospective actual loss.    This contract is for purchase of goods to be manufactured."

That plaintiff was at all times between September 15, 1917, and the 2d day of November, 1917, when the plaintiff terminated the contract, ready, able, and willing to perform and carry out its part of this contract, and the plaintiff performed such contract except in so far as performance

has been prevented of execution by the conduct of the defendant; that on October 30, 1917, plaintiff received from defendant a letter as follows:

"*Sheffield-King Milling Co.,*                    10—29—17.
        "Minneapolis, Minn.
    "Gentlemen: In reply to yours of Oct. 27th will say I will not remit you anything, but will cancel the contract for new wheat flour contract made May 7th, and effective after Sept. 15th to Jan. 1st, 1918.
    "I am satisfied to let the court decide what you are entitled to by my canceling this contract.
                "Yours truly,        F. S. JACOBS."

That by said letter the defendant intended to and did repudiate and cancel the contract of sale between the parties, within the meaning set out in said contract; that on November 2, 1917, pursuant to the terms of said contract, the plaintiff elected to and did treat the conduct of the defendant as a breach by the defendant of his contract, and did then on said day immediately terminate the contract in accordance with its provisions. In response thereto the plaintiff, on the 2d day of November, mailed the defendant the following letter:

"*Mr. F. S. Jacobs,*                    November 2, 1917.
        "Waupun, Wis.
    "Dear Sir:    Referring now to your contract with us dated Waupun, Wis., May 7, 1917, wherein we agreed to sell to you and you agreed to purchase from us, 205 bbls. of our "Gold-Mine" flour, to be packed in 49-lb. cotton sacks at the price of $12.10 per bbl., freight allowed to Waupun, Wis.
    "Beg to state that we have received your letter of the 29th ult., and have carefully noted its contents.
    "We regard your letter of the 29th ult. as a repudiation by you of your obligation under said contract.
    "We think it is equivalent to a statement to the effect that you will not perform your part thereof.
    "Since you have stated that you will not perform your part of the contract, we can see no reason why we should continue to remain in readiness to perform any longer, nor

can we see any reason why we should not take you seriously in your statement.

"We refer you to subdivision 'F2' of paragraph 9 on the back of your contract, and we hereby give you notice that we have this day elected under subdivision 'f' of paragraph 9 of your said contract, to treat your conduct, as evidenced by your said letter of the 29th ult., as a breach of your said contract, and we have this day terminated said contract and hereby demand that you pay us damages as set out in subdivision 'f' of paragraph 9 of said contract.

"We are giving you this notice pursuant to the terms of paragraph 9 of said contract, and sending you this letter by registered mail, requesting return receipt, so that you may govern yourself accordingly.

"The damages which we are entitled to recover from you on termination of your said contract are calculated as follows, pursuant to subdivision 'f' of paragraph 9 thereof:

Highest closing price per bu. of No. 1 Northern cash
    wheat (delivered) at Minneapolis, Minn., on May 7,
    1917 (date of contract) .......................... $3 08
Highest closing price per bu. of No. 1 Northern cash
    wheat (delivered) at Minneapolis, Minn., on Nov. 2,
    1917 (date of termination) ...................... 2 21
Decline in price of wheat per bu...................... 87
Number of barrels of flour unshipped under the contract:
    205 @ 4½ bu. wheat per bbl., 922½ bu.
First item of authorized recovery under the contract is the
    sum of 87c. per bu. decline in price of wheat multi-
    plied by 922½ bu. or............................. 802 58
Number of periods of 30 days each or fraction thereof in-
    tervening between May 7, 1917 (date of contract)
    and Nov. 2, 1917 (date of termination) : 6 periods.
Second item of authorized recovery is:
    1c. x 922½ x 6 ................................. 55 35
Third item of authorized recovery is:
    4c x 922½ .................................... 36 90

      Total authorized recovery.................. $894 83

"Yours very truly,

"SHEFFIELD-KING MILLING Co.

"HHK—O                                     President.

"C. C. Boorman."

"13. That on November 2, 1917, and at the time plaintiff took the action described in foregoing paragraph 10, no

portion of the flour described in the contract, Exhibit 'A,' had been shipped to defendant, but that all thereof then remained unshipped by reason of the fact that defendant had failed and refused to permit plaintiff to ship any portion thereof, and had, up to said time, failed, neglected, and refused to furnish plaintiff with shipping directions therefor in accordance with paragraph 1 of Exhibit 'A' or otherwise, and that at no time has any of said flour been shipped or delivered to defendant by reason of the facts aforesaid, and that plaintiff has been prevented and excused from shipping and delivering said flour, or any part thereof, by the aforesaid conduct of defendant."

That the damages sustained by the plaintiff as computed according to subdivision f of paragraph 9 and subdivision d of paragraph 2 of said contract amount to $894.83; that the highest closing price of No. 1 Northern (cash) wheat (delivered) at Minneapolis, Minnesota, on May 7, 1917, was $3.08 per bushel, and that the highest closing price of No. 1 Northern (cash) wheat (delivered) at Minneapolis, Minnesota, November 2, 1917, was $2.21 per bushel; and demanded judgment.

Defendant answered, admitting the corporate character and business of the plaintiff, and alleged that:

"He [defendant] admits the parties hereto entered into the contract as alleged in said complaint, and that the plaintiff accepted and confirmed the same and that the plaintiff has at all times been ready and willing to perform its part hereof.

"He admits that he sent to plaintiff the letter, a copy of which is set out in said complaint, marked Exhibit 'C,' and that in reply thereto the plaintiff sent to said defendant the letter referred to in said complaint, a copy of which is marked Exhibit 'D,' and that he duly received and retained the same.

"He admits no portion of the flour described in said contract has ever been shipped to said defendant and that he failed to give said plaintiff any shipping directions therefor.

"He admits the prices of wheat were as alleged in said complaint, and that said defendant has made no payment to said plaintiff on account of said contract.

"He denies each and every other fact alleged in said complaint, and especially denies that the said plaintiff suffered any damage whatever, through, under, or by reason of said contract.

"He alleges that said plaintiff suffered no damage whatever by reason of or under said contract and that the situation of said plaintiff arising from said contract is *'damnum absque injuria.'* "

The plaintiff moved for judgment upon the pleadings, the motion was granted, the judgment was rendered for $894.83 and costs, from which judgment the defendant appeals.

*C. E. Hooker* of Waupun, for the appellant.

For the respondent there was a brief by *Clark & Lueck* of Beaver Dam, attorneys, and *H. L. Hoidale* of Minneapolis, of counsel, and oral argument by *A. W. Lueck.*

ROSENBERRY, J.　Some doubt exists as to whether or not the answer raises any issue.　Giving to the allegations of the answer every reasonable intendment and the most liberal construction, we are constrained to hold that the allegation that there was no damage suffered by the plaintiff is equivalent to an allegation that the agreed measure of damages is unreasonable, and bears no relation to the actual damages suffered by the plaintiff, and the question of whether or not the agreed damages are in the nature of liquidated damages or a penalty is presented.　This is a most liberal construction, and one which we adopt the more readily for the reason that without objection the case has been argued and presented upon both sides upon that theory.　While the plaintiff in its brief stated that it contends that the simple allegation in the answer that respondent has in fact suffered no damage is not sufficient to put in issue the question of whether or not the contract is valid as providing for liquidated damages, or invalid as providing for a penalty, it assumes for the purpose of argument that that is the question before the court, and no other question is argued.

The defendant contends that the sum of $894.83 cannot be considered otherwise than as a penalty and cites *Hath-*

*away v. Lynn,* 75 Wis. 186, 43 N. W. 956; *J. G. Wagner Co. v. Cawker,* 112 Wis. 532, 88 N. W. 599; *Berrinkott v. Traphagen,* 39 Wis. 219; *Davis v. La Crosse H. Asso.* 121 Wis. 579, 99 N. W. 351; *Madison v. American S. E. Co.* 118 Wis. 480, 95 N. W. 1097; *Seeman v. Biemann,* 108 Wis. 365, 84 N. W. 490.

The courts of this and other states have gone a long way in protecting parties from their own contracts, and this upon the theory that a harsh and unreasonable contract will not be enforced when a party may be relieved therefrom within the established rules of law; but a party asking relief from a contract freely entered into, in the absence of fraud or overreaching, must bring himself within the field of judicial relief; and the fact that, as in this case, the result is harsh and burdensome, is not by itself sufficient to do that.

Courts will ascertain for themselves the real intent of the parties to the contract, and are not bound by the assertions of the parties themselves as to that intent, and the stipulated damages must appear to be grossly in excess of the actual damages, or have no relation thereto, before the court can say within established principles that the damages stipulated are a penalty. We take it that these fundamental principles are well established, and certainly are recognized in the Wisconsin cases above cited. See, also, 1 Sutherland, Damages (4th ed.) § 283 and cases cited.

The intent of the parties in this case is made clear by the recitals of the contract itself, and particularly so when they are considered in relation to the complicated and complex situation with which the contract deals. The contract is not one for the sale and delivery of an article to be procured in the open market and delivered to the purchaser. It is a contract for the manufacture of a commodity from a basic raw material. Actual damages could not therefore be established by showing the difference between the contract price of Gold Mine flour and the market price, assuming

that it had an established market price.   The inquiry would therefore involve purchase and storage of wheat, cost of manufacture into flour, and many other subsidiary questions.

While, as this court has said, "in determining whether an amount agreed upon as damages was intended as liquidated damages or as a penalty, rules of language are ignored, and the expressed intent of parties is made to give way to the equity of the particular case, having due regard to precedents," nevertheless, such a rule is applied only where damages may be readily computed and the "stipulated damages, so called, are largely in excess of the actual damages." *Seeman v. Biemann,* 108 Wis. 365, 374, 84 N. W. 490; 1 Sutherland, Damages (4th ed.) § 283.   In a case such as this, which is clearly one where the damages are difficult, if not almost impossible, to ascertain, to require a party to establish the actual damages as a condition precedent to his right to recover stipulated damages is in practical effect to refuse legal effect to his contract.   The courts are now strongly "inclined to allow parties to make their own contracts and to carry out their intentions even where it would result in the recovery of an amount stated as liquidated damages, upon proof of violation of the contract, and without proof of the damages actually sustained." *U. S. v. Bethlehem S. Co.* 205 U. S. 105, 27 Sup. Ct. 450.

It is argued that in the absence of an allegation in the complaint that the plaintiff had purchased No. 1 Northern wheat, and in the absence of an allegation that the article to be delivered was to be manufactured from No. 1 Northern wheat, the contract is speculative and ought not to be enforced.   Reference to the daily market reports, as well as to the proclamations of the President of the United States, issued February 21, 1918, and September 2, 1918, shows that No. 1 Northern wheat is one of the standard grades of wheat, to which in the primary markets of the country the prices of other grades of wheat bear a direct relation, and

the court may take judicial notice of the fact that the grade of wheat specified in the contract is one of the standard grades, and that the prices of other grades have a direct, although perhaps a varying, relation to it. The contract does not specify out of what particular grade of wheat the flour was to be manufactured. It is supposable at least that it might be made out of different grades purchased at different times, and depend to some extent upon the process of manufacture. It is certain that the flour was to be made of wheat, and that the price of all wheat bears a definite relation to the price of No. 1 Northern.

It is because of the fact that a manufacturer may not be able to trace into the manufactured product agreed to be delivered, specific purchases of material, that proof of actual damages becomes difficult and the stipulation of parties as to damages is permitted to stand in cases of this kind. The difficulties of the situation are well illustrated in the case of *Erie B. Co. v. Hubbard M. Co.* 217 Fed. 759; *Russell Miller M. Co. v. Bastasch,* 70 Oreg. 475, 142 Pac. 355; *River S. Co. v. Atlantic Mills,* 155 Fed. 466.

While the complaint does not allege that the parties have purchased any particular lot of wheat for the manufacture of the flour agreed to be delivered to the defendant, it does allege that the plaintiff was ready, able, and willing to perform and carry out its part of the contract, and that it had performed the same except in so far as performance thereof had been prevented by the conduct of the defendant. This must be taken to mean, as it certainly does mean, that the plaintiff had on hand the raw materials out of which the flour was to be manufactured and delivered.

It will not do for the defendant to enter into a contract such as the one set out in the complaint, wait until time of delivery, and, when performance is tendered, refuse to accept it, and in the light of subsequent developments violate the terms of his contract and then take that position which is most advantageous to himself. The validity of

a contract is to be determined as of the date of its execution, and a contract valid when made cannot be rendered invalid even by legislative action. *Superior v. Douglas Co. Tel. Co.* 141 Wis. 363, 122 N. W. 1023. It is the situation of the parties at the time of the inception of the contract that governs. *Davis v. La Crosse H. Asso.* 121 Wis. 579, 99 N. W. 351.

While the damages recoverable under the contract in this case are large and appear grossly disproportionate to the actual damages which the plaintiff may have suffered, we cannot, especially upon the facts set out in the record in this case, say that they are so as a matter of law. The contract was entered into on May 7, 1917, about one month after this country had declared war against the Central empires. No one knew or could foresee what the condition of the grain market would be a month, much less six months, in the future. The general situation must have been in the contemplation of the parties at the time this contract was entered into. It was well known that wheat is a basic, essential commodity. The food and fuel control act was passed by Congress August 10, 1917, and on August 30, 1917, a little more than two weeks before the defendant had a right to require delivery under the contract, the President, by proclamation, fixed the price of the 1917 crop on the basis of $2.20 a bushel for No. 1 Northern spring wheat at Chicago. No doubt this action of the government had a great influence, if it was not in fact directly controlling, as to the price of wheat. See War Industries Board Bulletin No. 9. As was said in *Sheffield-King M. Co. v. Domestic Science B. Co.* 95 Ohio St. 180, 115 N. E. 1014, having under consideration a contract similar to the contract involved here,

"The parties agreed that wheat, the thing from which the flour was to be made, should be the basis upon which to calculate damages. They could, of course, have agreed that the flour should be such basis, but they did not do so.

That was a matter for them to agree about.    They did not
fix an arbitrary lump sum which might turn out to be wholly
inequitable, but fixed a method, the chief element of which
was the price of wheat from which the flour was to be made,
a matter not within the control of either."

While in that case it was said that "when the plaintiff
proved it had performed the terms of the contract on its
part, had purchased the necessary wheat, and showed the
damages that had accrued on the basis agreed on, it was
entitled to recover," we think the allegation in the com-
plaint in this case, that the plaintiff was prepared, able,
ready, and willing to perform the contract, is an allegation
that it had on hand the materials out of which the flour to be
delivered to the defendant in this case was to be manu-
factured; at least no issue in that respect is tendered by the
pleadings in this case.

The inherent difficulties of proving the actual damages
in a case such as this are such as in practical effect to pre-
clude a manufacturer from recovering damages because of
the consequent expense and the disorganization of his busi-
ness.    The removal of auditors, accountants, managers, and
foremen from the business of a large highly organized con-
cern during the time necessarily consumed in a trial entails
an expense, in excess of recoverable costs, so great as to
prevent in many cases any reimbursement to a manufact-
urer.    Any one who has attempted to establish the amount
of actual damages in a case will fully realize this.    *Garton
Toy Co. v. Buswell L. & M. Co.* 150 Wis. 341, 136 N. W.
147, illustrates the difficulty in a comparatively simple case.

As was said by Judge CHRISTIANCY, this is a case "where,
from the nature of the contract and the subject matter of
the stipulation, for the breach of which the sum is provided,
it is apparent to the court that the actual damages for a
breach are uncertain in their nature, difficult to be ascer-
tained, or impossible to be estimated with certainty, by
reference to any pecuniary standard, and where the parties

themselves are more intimately acquainted with all the peculiar circumstances, and therefore better able to compute the actual or probable damages, than courts or juries, from any evidence which can be brought before them." *Jaquith v. Hudson,* 5 Mich. 123.

Modern business is so managed as to avoid litigation; the tendency is away from litigation—a tendency which should be encouraged in all fair and legitimate ways because it is conducive to the general welfare. Time and effort consumed in litigating questions of damages generally result in substantial financial loss to both sides. Stipulations of parties, therefore, which establish a plain, simple rule of damages, having a just and fair relation to the subject matter of the contract, in cases where the ascertainment of actual damages is difficult, ought, in the public interest, to be given legal effect. *U. S. v. Bethlehem S. Co.* 205 U. S. 105, 27 Sup. Ct. 450.

Where such contracts are entered into, which are fairly within established legal principles, it is not the business of the courts to interfere and attempt to set aside such stipulations, as has often been done with the result that while theoretical legal justice may be attained, as a practical matter justice is denied. There is no reason why courts should regard with paternalistic solicitude the situation of a party who has deliberately broken his contract. Contracts are not made to be broken but to be lived up to, and the loss, if any, in the event of breach, ought to fall on the wrongdoer rather than upon the innocent party. A litigant who is compelled to expend two hundred dollars to recover one hundred dollars damage, no question of fundamental principles being involved, does not feel that he has received justice, but rather that an injustice has been done him.

Parties to contracts are, as a rule, very much more familiar with the subject matter with which the contract deals, the conditions under which the contract is to be performed,

than courts and juries can possibly be, and where they attempt in a fair way to agree upon a method of computing damages in case of breach by either party they are much more likely to arrive at a just result than is court or jury upon a trial.    See *Sun P. & P. Asso. v. Moore,* 183 U. S. 642, 22 Sup. Ct. 240; *U. S. v. Bethlehem S. Co.* 205 U. S. 105, 27 Sup. Ct. 450; 1 Sutherland, Damages (4th ed.) § 283, p. 842; *Knox Rock B. Co. v. Grafton S. Co.* 64 Ohio St. 361, 60 N. E. 563.

It is suggested that, because the market price of No. 1 Northern wheat at Minneapolis is made the basis for computing the plaintiff's damages, the contract is therefore void as a gaming contract.    *Atwater v. Manville,* 106 Wis. 64, 81 N. W. 985; *Lowry v. Dillman,* 59 Wis. 197, 18 N. W. 4; *Barnard v. Backhaus,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595.    There is, however, not the slightest intimation in the record that the parties at the time of making this contract did not intend to carry it out in accordance with its terms.    In fact, every inference to be drawn from the conduct of the parties, both at the time of the inception of the contract and down to the time of its breach, indicates clearly and definitely that it was the intention of the parties to perform it.    It is therefore a valid contract.    *Wall v. Schneider,* 59 Wis. 352, 18 N. W. 443.    The fact that the great market places of the world are made use of by gamblers in the conduct of an illegitimate and unlawful business does not alter the fact that organized markets are not only proper but necessary under modern conditions.    They perform a valuable and serviceable function in the process of distribution, and there is no reason why prices established there may not be made the basis for adjusting contract rights.

It is apparent that at the inception of the contract the probable damages which the plaintiff might suffer in the event of a breach by the defendant would be difficult of ascertainment and uncertain.    The parties agreed upon a fair basis of computation, and, while the amount recovered

is large, great variations in the market price of wheat and flour must have been anticipated by the parties, and in view of all the circumstances the amount recovered is not unconscionable. The contract was in no way a gaming contract, and was therefore valid, and the judgment of the circuit court was right.

*By the Court.*—Judgment affirmed.

ESCHWEILER, J. (*dissenting*). By the affirmance of the judgment of the court below judicial sanction and thereby judicial approval is given .to the allowance as stipulated damages of an amount of not less than $4 per barrel for breach of a contract to buy such a staple necessary essential as flour, sold at the agreed price of $12.10 per barrel.

This item of so-called damages necessarily includes the profits of the transaction, and under the facts here can be reasonably construed to include nothing but profits.

If this is a legitimate, reasonable, and lawful profit between miller and wholesaler, it would have to be held to be such in a similar contract for the further sale of this same flour from the wholesaler to the retailer, and then again between the retailer and consumer. It presents a vista of hope for him who wishes to profit in the necessaries of life, but a rather hopeless horizon for the producer and the consumer.

This contract was made May 7, 1917, for delivery between September 15th and January 1st following. The United States Food Administration, by a regulation published August 24, 1917, declared that the maximum average profit of twenty-five cents per barrel of flour was reasonable and any profits in excess "unjust and unreasonable." This twenty-five cents per barrel profit, although of course not controlling as to this contract of an earlier date, is cited here in contrast with the $4 per barrel allowed by this judgment. In the same bulletin appears the following:

"In order to prevent hoarding and speculation in contracts for futures, no miller shall make, or have outstand-

ing at any time, any contract for the sale of flour or feed, except such contracts as require shipment of such produce within thirty days after the making of such contracts."

This quotation speaks for itself as to the view taken by the federal food administration on the possibility of just such contracts as are here involved being aids or instruments for hoarding and for speculation in contracts for futures, which is but another expression for gambling.

In the absence of evidence showing such a state of facts or circumstances surrounding this particular contract as would overthrow the *prima facie* showing of grossness, exorbitance, and swollen profits, I think the court should declare that such a stipulation resulting in such damages, whether it was therein definitely fixed at $4 per barrel or the same result reached by the agreed application of the multiplication table, is *prima facie* for a penalty and not for legal recoverable damages; leaving open to the plaintiff, however, the right of showing the court upon evidence that the facts and circumstances in this case warrant the allowance of these amounts as within the field of reasonable damages.

From these elements of exorbitance and the apparent absence of any reasonable connection between the method of computation and the actual performance of the contract, it meets all the requirements so repeatedly recognized under the general rule, and particularly by this court, as distinguishing a penalty from liquidated damages. *Seeman v. Biemann,* 108 Wis. 365, 374, 84 N. W. 490; *Davis v. La Crosse H. Asso.* 121 Wis. 579, 589, 99 N. W. 351; *J. G. Wagner Co. v. Cawker,* 112 Wis. 532, 541, 88 N. W. 599; *Grant M. Co. v. Marshall & Ilsley Bank,* 166 Wis. 547, 555, 165 N. W. 14. See, also, *Joeckel v. Johnson,* 178 Iowa, 231, 159 N. W. 673, 676.

Both of the elements of extraordinary disproportion between the agreed damages and the damages which might result, or of exorbitance, are always recognized as throw-

ing such a stipulation into the class of penalties rather than of stipulated damages in those cases even where the indefinite and uncertain element of time delay is the basis. It is so expressly stated in the case cited in the majority opinion of *U. S. v. Bethlehem S. Co.* 205 U. S. 105, 121, 27 Sup. Ct. 450, and repeated in *Maryland D. & C. Co. v. U. S.* 241 U. S. 184, 190, 36 Sup. Ct. 545; *Wise v. U. S.* 249 U. S. 361, 365, 39 Sup. Ct. 303; *In re Liberty Doll Co.* 242 Fed. 695, 701.

And such penalties are not enforced not from any desire to—quoting now from the majority opinion herein—"regard with paternalistic solicitude the situation of a party who has deliberately broken his contract," but because a court refuses to be the third and enforcing party to an unconscionable agreement which for that reason is against public policy. *Richmond v. Conservative L. Ins. Co.* 166 Wis. 334, 341, 165 N. W. 286. Neither is he who speculates in food entitled to sympathy or solicitude.

It has long stood as a definitely declared principle recognized by this court that in executory contracts of sale the right to break such a contract, subject of course to respond in damages, is on substantially the same footing as the right to make just such a contract. *Haueter v. Marty,* 156 Wis. 208, 212, 145 N. W. 775; *Woodman v. Blue Grass L. Co.* 125 Wis. 489, 494, 103 N. W. 236, 104 N. W. 920; *Badger State L. Co. v. G. W. Jones L. Co.* 140 Wis. 73, 79, 80, 121 N. W. 933. And again in *Malueg v. Hatten L. Co.* 140 Wis. 381, 384, 122 N. W. 1057, where this court adds that such breach of contract, without proof of legal damages, gives to the other party no right of recovery. Page 386.

There being no element of tort involved here, the general rule of liability for breach of contract is as was stated in *McLennan v. Church,* 163 Wis. 411, 422, 158 N. W. 73, "the limit of recovery is such damages as may be reasonably considered to have been in contemplation by the parties at the time of making the contract as the probable result of a

breach of it." See, also, *Malueg v. Hatten L. Co., supra,* at p. 385.

Conceding for the purposes of this case that although parties to such a contract have the legal right to breach it as to the conditions therein contained as to performance, but must nevertheless be held as to the conditions therein expressed as to the damages, yet such damages must nevertheless be such as were within the field of legal, reasonable anticipation of the parties at the time of making. If the final result savors of a penalty rather than legal damages, then such result was not within the reasonable anticipation of the parties and ought not to be enforced by the court.

Merely because the plaintiff asserts in its contract and defendant acquiesces that the milling business is so complicated and mysterious that its profits cannot be ascertained, ought not to deter a court from examining into its business, any more than a similar suggestion to the tax assessor should bind him to accept what is offered rather than to insist on what is due. Joint declarations of the parties that the unconscionable is conscionable, or that their ways of doing business are beyond ken, should neither blind nor bind the court.

Furthermore, the provision of the contract now offered, fixing the measure of damages by the fluctuation in the price of No. 1 Northern wheat on the Minneapolis market, is, from what appears in this record, a gamble and therefore void. When the principal contract is so tainted or a subsidiary contract is, with knowledge of the party seeking to recover thereon, based upon such a tainted transaction, there can be no recovery. *Kassuba C. Co. v. Blodgett,* 155 Wis. 529, 531, 143 N. W. 1060, 145 N. W. 177; *Carson v. Milwaukee P. Co.* 133 Wis. 85, 91, 93, 113 N. W. 393; *Olson v. Sawyer-Goodman Co.* 110 Wis. 149, 85 N. W. 640; *Atwater v. Manville,* 106 Wis. 64, 81 N. W. 985.

There is here evidently no attempt at a compliance with

sec. 2319a, Stats., relating to board of trade contracts. That there was no intention to either purchase for defendant, or to use in the manufacture of the flour which was the subject of the contract, No. 1 Northern wheat whose falling price determined the measure of plaintiff's damages and profits (plaintiff having carefully reserved the right under par. 2a, applicable as here but in the case of a rising market, to "treat the contract as if rescinded without damages to either party"), is evident from the following:

First, there is no provision in the contract for such purchase or use and no allegations of such in the complaint; there was therefore nothing in that regard for the defendant to deny.

Second, at no time could either defendant or plaintiff successfully have maintained under this contract that plaintiff was holding or obliged to hold for defendant any quantity of wheat of any grade.

Third, the idea of a wheat contract is expressly negatived by the language of the contract itself, in paragraph 10, "this contract is for the purchase of goods to be manufactured," and in paragraph 5, "goods shall not be deemed manufactured until shipped;" plaintiff thereby expressly excluding the idea of any obligation on its part to manufacture flour for this contract prior to an order for shipment, and therefore is really binding itself to ship from a stock of flour only and not from a stock of wheat, and that is all that its allegations of readiness and compliance with the contract on its part should reasonably be extended to cover.

Under the method of computation provided for of four and one-half bushels of wheat to the barrel of flour, there is a resulting surplus of seventy-four pounds in weight, certainly of some value to plaintiff but not accounted for to defendant in assessing the damages, and yet upon which he is charged. If this contract contemplated the purchase for

him of wheat, it is manifest that plaintiff has withheld items of value from defendant's wheat for which it should account.

If, as a matter of fact, plaintiff bought no wheat for this particular sale of flour or bought none until it was ready to deliver upon order of defendant pursuant to the contract, it could then have bought, to make good its depletion in its stock of flour, wheat at the then market price, and there would have been no actual damage, and it would have paid no actual carrying charges, although it has been allowed that also as damages in this case in addition to the $4 per barrel.

If it did manufacture this order of flour it was its duty to minimize damages arising from the breach of defendant in refusing to buy by disposing of this flour at the best market price then obtainable. *Centennial E. Co. v. Morse,* 227 Mass. 486, 490, 116 N. E. 336. If such price was not below the contract price there was no recoverable damage; if lower, the difference measured the legal damage and is the proper measure thereof. *Stock v. Snell,* 213 Mass. 449, 100 N. E. 830; *Hall v. Paine,* 224 Mass. 62, 65, 112 N. E. 153.

This case was disposed of in the court below on the case quoted in the majority opinion of *Sheffield-King M. Co.* (this plaintiff) *v. Domestic S. B. Co.* 95 Ohio St. 180, 115 N. E. 1014. There must be noted, however: The contract there was made in 1912 and the price was $4.75 per barrel as against the $12.10 here; there is nothing to show what proportion the amount recovered as damages bore to the contract price there, or that the question of grossness of profits was before the court. And there, by implication at least, the court recognized the necessity of plaintiff's doing in that case what, it appeals to me, the plaintiff should be required to do here, namely, show that it purchased the wheat for that contract, if it desires to recover damages for any depreciation in wheat price, when that opinion says: "In this situation, when the plaintiff proved it had per-

formed the terms of the contract on its part, *had purchased the necessary wheat,* and showed the damages that had accrued on the basis agreed on, it was entitled to recover." *Erie B. Co. v. Hubbard M. Co.* 217 Fed. 759, also cited in the majority opinion and in the Ohio case, based the right to recover such a difference in wheat price upon an express showing made therein by plaintiff of an actual purchase of wheat made at the time of the making of the contract to meet the requirements. That essential fact is missing in this case.

If the answer herein was not sufficient to properly present the issues that should be tried between these parties, then, under sec. 2405*m*, Stats., it is the duty of this court to direct that they shall be tried.

I think the judgment should be reversed and the plaintiff put to its proof to show that what on its face appears to be illegitimate was legitimate, and what stares out from this measure of damages as an element of extortion and speculation was nevertheless an actual, substantial, and legal element of damage.