INTERNATIONAL MILLING CO., Respondent, v.
REIERSON, et al, Appellants.

(225 N. W. 218.)

(File No. 6432.   Opinion filed May 7, 1929.)

*Charles F. Tym,* of Paris, Ill., and *E. E. Wagner,* of Mitchell, for Appellants.

*H. G. Giddings,* of Mitchell, for Respondent.

BURCH, J. This action was brought to recover $820.44 as damages for breach of a contract for the purchase by defendants of 420 barrels of flour at $9.80 per barrel in bulk. The contract was dated January 26, 1925, and broken March 18, 1925. The damages are claimed under and computed on the basis of a provision of the contract as follows: "As to any of the above wheat flour remaining unshipped by reason buyer's breach or default, seller shall recover from buyer liquidated damages as follows: (a) a sum equal to 4c multiplied by the number of bu. of wheat required to make such unshipped flour, figuring 4¾ bu. to the bbl. of flour; plus (b) a sum equal to 1c multiplied by the said number of bu., which such shall be calculated for each 30 days, or fraction

thereof, intervening between date hereof and date of breach; plus (c) amount of decline, if any, per bu. from date hereof to date of breach, in highest closing price, at Mpls., of number 1 Northern Spring wheat, multiplied by said number of bu. In case of a rise in such price of such wheat between said dates, instead of a decline, seller shall recover the sums at (a) and (b), above, less a sum determined by multiplying amount of such rise, per bu. by said number of bu. such prices on the date hereof and date of breach being taken to ascertain amount of decline or rise per bu. Any carrying charges paid by buyer to seller on such wheat flour only shall also be deducted from seller's said recovery. If there is neither rise nor decline in such price, seller shall recover the sums at (a) and (b) above, less such carrying charges paid, if any. If date hereof falls on a Sunday or a Minnesota legal holiday first day following, other than a Sunday or such holiday, shall be treated as date hereof for sole purpose of determining decline or rise in wheat price under this Par. Such wheat prices as shown by 'Daily Market Record,' of Mpls. Chamber of Commerce shall be conclusive unless proven materially erroneous. As to other mill products or grain (if any of either are specified above), so remaining unshipped under this contract, if any, seller shall recover carrying charges unpaid thereon, if any, and difference between above purchase price amount of freight allowance, if any, on such other mill products, or grain, and value thereof to seller, in carload lots, at said Sioux City, based on seller's minimum selling price on date of breach, if such value be less than such purchase price; but, if such value is greater than such purchase price (after first deducting from such purchase price freight allowance, if any, as aforesaid) the difference shall be credited to buyer, not to allow buyer recovery by solely in reduction of damages (if any), recoverable by seller, under this Par., on such wheat flour."

The nature of the contract is disclosed by a clause reading: "This is a contract to sell goods which (except as to grain contracted for, if any) are to be manufactured."

Defendants admit signing the contract, but deny its delivery. They say they are extensively engaged in the bakery business; that agents of plaintiff called at their store in Mitchell to sell them flour the day before the contract was made; that the contract was executed in reliance upon negotiations with plaintiff through its

agent, Kelly, who, representing himself to be sales manager, agreed that, in the event of a decline of flour, defendants should not be liable for more than 30 cents a barrel. The negotiations effecting this agreement are stated in defendant's brief as follows: "O. H. Reierson, who was acting for defendants, stated that he would not buy any flour at the price asked 'unless there was stop loss at thirty cents a barrel put on it.' Kelly stated that there was a shortage of wheat and that the market on flour would no doubt go higher. Later in the evening Kelly returned to the store and Reierson again stated, 'I wouldn't buy any flour unless I could put a stop loss of thirty cents a barrel on it.' That 'Kelly said he would put a stop loss of thirty cents a barrel on flour if I would give him an order. * * * Mr. Kelly said that this order would be held on his desk and that if the market should break that the flour would not be shipped at the price of the written contract. That if it dropped thirty cents a barrel he would send me a bill for the thirty cents a barrel which would be a hundred and twenty six dollars and if I needed the flour I would order it out and pay for it for what it was worth on the day it was shipped. I was leaving on the morning train for Sioux Falls. * * * Mr. Kelly and Mr. Robbins presented a paper for my signature, the one that has been referred to in evidence as Exhibit A. It was on a book. The leaves were attached in book form. I did not see anything that appeared on the back of that sheet that bears my signature or anything that appears thereon now. * * * When I signed the contract there I stated at that time to Kelly again "You should have some notation on here with reference to the stop loss to protect me." Mr. Kelly said he was sales manager at Sioux City and had exclusive charge of the sales and that this would be placed on his desk and would get no further. If the price of flour should drop he would send me a bill for the thirty cents a barrel and I was to send him a check for it. It was in reliance upon what Kelly and Robbins said to me there, as I have detailed, that I affixed the signature of Reierson Grocery Company to Exhibit A. I would not have signed it but for the statements made by Mr. Kelly which I have stated here.' "

As bearing on the validity of this oral agreement with Kelly, it should be noted that the contract provides: "Only authority of seller's salesman is to sign this contract for, and transmit same to seller (for acceptance or rejection by it)." Kelly did not hold the

contract, but forwarded it promptly to plaintiff's head office at Minneapolis, and its acceptance was made, and notice thereof sent to defendant promptly.

At the close of the case the trial court directed the jury to return a verdict in favor of plaintiff for $820.44, the amount claimed by plaintiff computed as provided by the contract. From a judgment entered thereon, and an order denying a new trial, defendants appeal.

The assignments of error present two questions: First, was there a valid delivery and consummation of the contract? Second, are the provisions of the contract relating to damages for breach valid and enforceable?

What appellants term a conditional delivery of the contract would seem to be more accurately described as a delivery of the contract to, and its acceptance by, respondent in the expectation that it would bind all parties and be carried out, with an oral agreement that, if the price of flour declined 30 cents a barrel, Kelly would cancel the contract and charge appellants with the loss occasioned by the decline. To effect this, Kelly was to keep the contract on his desk, so that he might cancel it and give effect to the stop loss agreement. It would be idle to make such elaborate provisions to secure a stop loss if there was no binding agreement by which a loss could occur. Appellants admit liability for loss to extent of 30 cents per barrel, $126, but deny liability for more. In other words, they admit the contract subject to an oral modification, made at the time and as a part of the agreement.

It is elementary that a written contract, complete in respect to a matter, cannot be contradicted and altered by proof of a contemporaneous oral agreement. Our Code, section 860, R. C. 1919, provides: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument." See, also, Black Hills Nat. Bank v. Kellogg, 4 S. D. 312, 56 N. W. 1071; Dean v. First Nat. Bank, 6 Dak. 222, 50 N. W. 831; Lewis v. R. Co., 5 S. D. 148, 58 N. W. 580; Schmitz v. Hawkeye Gold Min. Co., 8 S. D. 544, 67 N. W. 618; Rosholt v. Woulph, 40 S. D. 269, 167 N. W. 158; Anderson v. Matheny, 17 S. D. 225, 95 N. W. 911; Bowen v. Mutual Life Ins. Co., 20 S. D. 103, 104 N. W. 1040; Schriner v.

Dickinson, 20 S. D. 433, 107 N. W. 536; Gardner v. Welch, 21 S. D. 151, 110 N. W. 110; Kimm v. Wolters, 28 S. D. 255, 133 N. W. 277.

Appellants cite De Rue v. McIntosh, 26 S. D. 42, 127 N. W. 532, to support their position that oral testimony of the parol agreement is admissible. That was a suit to recover the price of digging an artesian well. And the defense was that the well did not produce the water agreed to be furnished. Plaintiff agreed to drill a "flowing well" to be drilled to "artesian flow." This court held that parol evidence that the well was for use of a large ranch, known to the contracting parties, and that plaintiff represented that he would "furnish sufficient water for the purpose for which the defendant desired to use the same," was admissible, saying: "The contract in this case simply provides for a flowing well but fails to, in any manner, specify the amount of water to be discharged from said well. For the purpose of understanding what the term 'flowing well' was intended to mean in the contract it was clearly proper for the defendant to allege and prove the representations of the plaintiff, * * * for the purpose of explaining what was meant by the term 'flowing well.'" That case is not applicable to the facts of the case at bar. Another case cited by appellants, Koester v. Northwestern Port Huron Co., 24 S. D. 546, 124 N. W. 740, pertains to a conditional delivery, clearly distinguishable from the case at bar. Herron v. Brinton, 188 Iowa 60, 175 N. W. 831, pertains to consideration. Carpenter v. Carpenter, 141 Wis. 544, 124 N. W. 488, pertains to an escrow. None of them are in point. Appellants' position seems to be that mere manual delivery without mutual intent to give effect to the instrument is not sufficient to constitute a delivery, and that the intent may be shown by parol evidence. Their law is not applicable to their case. The situation in this case does not warrant a finding that the delivery was conditional.

The other question, are the contract provisions relating to damages in the event of a breach of the contract valid and enforceable, is perhops the more important. Appellants contend that such provisions are void under section 895, R. C. 1919; that, being void, the measure of damages is prescribed by section 1975, R. C. 1919, and, there being no evidence of damage thereunder, the evidence is insufficient to support the verdict.

■ The measure and method of computing damage for a breach of this contract was sought to be fixed by contract, and the verdict is based upon the contract. If this was a legitimate and proper subject of contract, then the trial court was right in looking to the contract and assessing the damages accordingly, although the measure may not have been that prescribed by statute in the absence of contract on the subject, or that generally prescribed by the courts in the absence of a statute or contract. Generally courts do not look with favor upon penalties and forfeitures upon breach of a contract, and will not enforce a forfeiture, although stipulated for in the contract. But courts will allow such an amount as will fairly compensate the injured party for a wrong done him. Thus it may be said that a provision in a contract for the forfeiture as a penalty, in the event of a failure to comply with the contract, will not be sustained, and such provision will be held void. On the other hand, parties may contract at will on the subject so long as the method employed is calculated to provide only fair compensation for loss incurred as a result of the breach, and not to penalize the defaulting party.

■■ Declaratory of that general common-law rule is section 895, R. C. 1919, which provides: "Every contract, by which the amount of damages to be paid, or other compensation to be made for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided by the next section."

The next section (896) provides: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

It is not apparent that these sections do, or were intended to, modify the common-law rule. If they do not, then the validity of such provision is to be determined by its character. If the provision can be said to provide only fair compensation for the loss incurred by the injured party, it is valid. But if it appears to provide a penalty in fact, although in the guise of damages, it is void. If the damages contracted to be paid are in fact fair and compensatory only, then the provision should be enforced. If not, so far as such damages exceed fair compensation for loss incurred, they should

not be recovereable. In the instant case no amount to be paid was fixed. The amount is as uncertain as that under the measure fixed by statute, and apparently the damages are composed of the same elements. The statutory measure is the difference between the contract price and the market value of the flour on the date of the breach. The contract measure is the same based on the price of wheat, the raw material from which the flour is to be made, with small additional charges to which we will later refer. There is no evidence that the measure agreed to will give more than compensatory damages, or include any element not recognized and allowed by law, or that any greater sum will be recovered than would be if the statutory measure were used. So far as appears, the contract measure is merely intended to provide a more convenient method for ascertaining damages under contracts to purchase flour to be theerafter manufactured because of conditions peculiar to the flour industry. It is claimed to be framed to meet conditions in the milling business whereby the miller on receiving an order for flour for future delivery immediately purchases an amount of wheat sufficient to make the flour. And we cannot see that it makes any difference whether the wheat is actually received and held in storage, or carried on the board of trade as a "hedge," so long as no more wheat is purchased than is necessary for making the flour. Appellants say that it has all the elements of a gambling contract. It lacks the element of gambling, if the wheat purchased is eventually to be accepted and used in making flour to fulfill the contract.

The flour ordered by appellants was known as respondent's "Robin Hood" brand. It is said the Robin Hood brand of flour is a mixture of wheats, and that there is no evidence it is made of Northern Spring No. 1, the quality of wheat upon which the computations are based. That may be so, and yet the fluctuations in the price of Northern Spring No. 1 on the Minneapolis open market may fairly reflect the fluctuations in the several kinds of wheat that go into the manufacture of that brand of flour. The difficulty in ascertaining the prices of the different wheats from day to day on the market argues in favor of a fixed standard, if that fairly reflects the fluctuations. The parties familiar with the business having contracted that such method does fairly fix the actual loss in the event of a breach of contract, we cannot say that it does not in the absence of proof. The flour was never manufactured, and

never came into existence. That this situation might result was known to the parties and could be anticipated by contract. There does not appear on the face of the transaction anything unreasonable in measuring the loss to the seller on the raw material to be bought which might never be made into flour, but would be sold in its raw state, if the contract was abandoned.

The right to so contract has been upheld in a number of cases involving almost the identical contract involved here. The Supreme Court of Ohio in Sheffield-King Milling Co. v. Domestic Science Baking Co., 95 Ohio St. 180, 115 N. E. 1014, held that, where parties to a contract deem it advisable, they may stipulate what the measure of damages shall be in event of a breach by either. And in construing the contract, the question whether a penalty is imposed, or liquidated damages contracted, the court will in the absence of fraud or circumvention look to all the terms of the contract, and the language used to express the intention of the parties. A provision very similar to the one under consideration by us was by that rule upheld in that case.

Practically the same contract was before the Supreme Court of Wisconsin in Sheffield-King Milling Co. v. Jacobs, 170 Wis. 389, 175 N. W. 796, and upheld in a well-reasoned case. The same result was reached by the Supreme Court of Michigan, in New Prague Flouring Mill Co. v. Hewitt Grain & Provision Co., 226 Mich. 35, 196 N. W. 890; by the Appellate Court of Illinois, First District, in Christian Mills v. Berthold Stern Flour Co., 247 Ill. App. 1; and by the Supreme Court of Missouri in Yerxa, Andrews & Thurston v. Randazzo Macaroni Mfg. Co., 315 Mo. 927, 288 S. W. 20. In all of those cases substantially the same contract provision was under consideration that is now before us, and the same question was involved.

Appellants have not called our attention to any case in point to the contrary. In a number of cases cited the court mentioned the measure of damages where there was no agreement in reference thereto. Those cases are not in point. In Russell Miller Milling Co. v. Bastach, 70 Or. 475, 142 P. 355, no contract provision was involved, but plaintiff was seeking a recovery on another basis on the ground that the contract was a sale of goods to be manufactured. The court said: "For aught that appears in this case, the plaintiff could have gone into open market and purchased flour

to fill its contract." A case involving a similar contract but very different issues is cited. New Prague Flouring Mill Co. v. Spears, 194 Iowa, 417, 189 N. W. 815. Here the plaintiff sought to hold defendant to the damages expressed in a similar contract provision, but plaintiff fixed the dates of the breach of the contract long after the time when the buyer expressly repudiated it. The court refused to construe the contract so as to bind the buyer indefinitely at the option of the seller after an express repudiation. The court held that, subject to liability in damages, the right to refuse performance inheres in every executory contract, no matter how stringent or specific, and as a result of that holding declared the breach of the contract was complete on the day it was expressly repudiated; that plaintiff not having proved damages with reference to that date failed in proving damages under the contract, or otherwise. The case is not in point, nor does it sustain appellants' contention in principle.

As to the items (a) and (b) in the provision for damages, respondents suggest that the provision for 4 cents per bushel of wheat (item a) amounts to about 19 cents per barrel of flour, and is intended to cover the net profit to be made in manufacturing the flour, while the 1 cent (item b) per bushel of wheat for every 30 days the contract continued before its breach is intended to cover carrying charges on the wheat, such as storage, insurance, and interest. Those are all legitimate elements of damage on breach of such contracts, and we can see no reason why the parties may not contract for a method of calculating such elements, so long as the method employed reaches only a fair compensatory result. There is no evidence that such was not the result. On the contrary the result is 19 cents per barrel net profit for manufacturing the flour, the amount of wheat purchased being 1,995 bushels, equaling 4¾ bushels of wheat to the barrel for making 420 barrels of flour. It is not contended that less wheat would have been sufficient. The carrying charges amount to $39.90 for two months on an investment of more than $3,500, including insurance and storage of the wheat. To this is added the loss on the wheat by decline in price from $1.89⅝ on January 26th, the date of the contract, to $1.45½ on March 17th, the date the contract was canceled. The result would seem to be as near the actual loss as could well be ascertained. Northern Spring No. 1 wheat, on which the decline is

based, may not be the exact Millers Mixture to manufacture Robin Hood flour, but, if it is a fair basis from which to make the computations, the parties may adopt it to avoid complicated computations on the market price of several qualities of wheat which must be obtained to make the proper mixture for that particular brand of flour. If appellants would escape their agreement, they must show that the actual damage was less than that claimed, and that some portion claimed by respondent is and was intended to be a penalty and not liquidated compensatory damage. This they have failed to do or attempt.

In their reply brief appellants complain that the contract is long, involved, technical, hard to understand, printed in very fine print on a single sheet of paper, impossible to read without great effort and time, and in effect that it is not entitled to respect as a mutual contract between understanding parties. Whether this arraignment of the contract is justified or not is immaterial, for appellants do not claim they did not understand or know its contents. Evidently they knew there might be a loss, for they sought by an oral agreement to limit the loss to 30 cents per barrel. Their failure to incorporate the stop loss clause in the written contract seems to be the cause of the greater loss they are now compelled to pay.

Finding no error in the record, the judgment and order appealed from are affirmed.

MISER, C., sitting in lieu of BROWN, J., absent.

SHERWOOD, P. J., and POLLEY, CAMPBELL, and MISER, JJ., concur.