## LARABEE FLOUR MILLS CO. v. CARIGNANO.*

### No. 377.

Circuit Court of Appeals, Tenth Circuit.
March 30, 1931.

*Rehearing denied June 1, 1931.

152

A. A. Davidson, of Tulsa, Okl. (H. M. Noble and McCune, Caldwell & Downing, all of Kansas City, Mo., and West, Gibson, Sherman, Davidson & Hull, of Tulsa, Okl., on the brief), for appellant.

S. A. Horton, of Oklahoma City, Okl. (Claud Briggs, of Wilburton, Okl., on the brief), for appellee.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

This is an action at law for breach of a contract to buy flour. The jury returned a verdict for the defendant—the buyer—and plaintiff appeals. The principal error assigned is that plaintiff was entitled to an instructed verdict for the amount of damage fixed by the contract. This assignment calls for the decision of two questions: Was the contract confirmed? If so, is the agreement as to the amount of damage enforceable?

There is little law involved in the first question. The order for the flour was signed by the buyer, the "party to be charged" under the Oklahoma statute of frauds (Comp. St. Okl. 1921, § 5034, subsec. 4). Edgar v. Reeser (C. C. A. 10) 46 F.(2d) 277; Kingfisher M. & E. Co. v. Westbrook, 79 Okl. 188, 192 P. 209; Harper v. Goldschmidt, 156 Cal. 245, 104 P. 451, 28 L. R. A. (N. S.) 689, 134 Am. St. Rep. 124; Beckwith v. Clark (C. C. A. 8) 188 F. 171; Williston on Contracts, vol. I, § 586. The order provided that "this contract is subject to confirmation by the seller." It was therefore necessary that the order be confirmed within a reasonable time, and the fact of confirmation communicated to the buyer. But confirmation need not be in writing, nor in any particular form. Confirmation of an order is but an acceptance of an offer, and may be accomplished orally, or by acts, or by both. Milliken-Tomlinson Co. v. American Sugar Refining Co. (C. C. A. 1) 9 F.(2d) 809; Williston on Contracts, vol. I, §§ 70, 90, 93.

Whether an offer has been accepted is a question of fact. On an appeal in an action at law, conflicting evidence must be resolved in favor of the prevailing party, and a verdict of a jury is conclusive if it is supported by substantial evidence. If, on the other hand, all of the substantial evidence is one way, the question presented is one of

law, and the trial court should direct a verdict. A scintilla of evidence will not support a verdict in the United States courts. Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597; Woolworth v. Davis (C. C. A. 10) 41 F.(2d) 342, 347; Waddell v. A. Guthrie & Co. (C. C. A. 10) 45 F.(2d) 977, 978.

The first point then turns on the facts. Defendant concedes that on July 17, 1928, he signed a document entitled "Millers' National Federation Uniform Sales Contract" and handed it to W. Brooks, a salesman for plaintiff. That contract recites that the plaintiff sells and the defendant buys "the following commodities, to be manufactured, F. O. B. cars to initial carrier at shipping point." The commodities listed were 5000 barrels of Cream Loaf flour at $6.40 per barrel, and 100 barrels of Dixie Dream flour at $7.65 a barrel. The time of shipment was fixed as June 1, 1929, the buyer having the right to order out the flour at any time in the interim on fourteen days' notice. The contract was signed by defendant, but was not confirmed on the contract itself, although a space was provided for that purpose.

The next day, the home office, by telephone, instructed Mr. Brooks to wire a confirmation of the order, and pursuant to that authority he wired defendant as follows:

"C. Carignano, Wilburton, Oklahoma. Confirm five thousand barrels loaf six forty June first.
"Larabee Flour Mills."

The defendant admits receiving this wire; it sufficiently identifies the contract intended to be confirmed, for, while it does not mention the small item of 100 barrels of Dixie Dream flour, the amount, price and time of shipment of the 5000 barrels of Cream Loaf flour is specified. The defendant, in his testimony, makes no point of the omission of the 100 barrels, but claims that later in the day Brooks telephoned him that "I wired you the confirmation I try to put it through and you going receive confirmation from the headquarters."

The plaintiff then bought 23,460 bushels of wheat to cover this flour contract, although there is no proof that defendant was advised of this purchase. On August 9, defendant, in writing, sent plaintiff shipping instructions for 600 sacks of "Ætna Best" flour. It appeared that plaintiff and defendant had entered into a contract during the previous wheat-year for flour at $6.90 a

barrel, of which about 300 barrels remained unshipped when the new contract was made. When the August 9 shipping instructions came in, plaintiff advised defendant that it was applying the order against the old contract at $6.90, instead of against the new contract at $6.40. When defendant received this advice, he wired to cancel the order of August 9. An agreement was then made to cancel the unfilled portion of the old and higher priced contract, and to apply the August 9 order against the newer and lower priced contract, applying the usual differential on account of the difference in brands. The defendant accepted the shipment.

During the next eight months there were fluctuations in the price of flour, of which defendant was advised; at intervals defendant ordered out 885 barrels of flour. Yet, no matter what the current market was, the defendant was always billed at the contract price, and defendant uniformly accepted the flour and paid for it at the contract price. In instructions given for such shipments, signed by defendant, a price would be fixed for feed stuffs and certain brands of flour; but on Cream Loaf or Dixie Dream, either no price would be extended in the column for price, or there would be written in the symbol "Con." standing for contract. That defendant ordered out this flour, accepted it, and paid for it at the contract price, is undisputed. In his amended answer, defendant explains this by alleging that "in each instance the delivery by plaintiff and acceptance by defendant of flour thereafter, was on independent purchase contracts as to each separate shipment thereof." But this explanation would not hold water, for the shipping orders carried no price, and the flour was all paid for at the same price, although ordered out at intervals and when current prices did not conform. So in the evidence no attempt was made to establish this explanation; instead, an explanation was offered that was not pleaded, to wit, that defendant intended these shipping instructions to apply against the contract of the year before. This explanation does not dovetail into the record facts. The old contract was at $6.90 a barrel; he only paid $6.40 for the flour; there were only 300 barrels due on the old contract on July 1, 1928, but he ordered out 885 barrels; and the old contract was canceled by mutual consent before any of these shipments was ordered out. Defendant asserts that some salesman voluntarily reduced the old contract from $6.90 to $6.40 a barrel, but no proof of any such authority is shown

or claimed. The other inconsistencies are not explained.

The plaintiff wrote defendant on January 2, 1929, and again on January 30, calling attention to the unfilled balance of the contract, and urging him to order out the flour more rapidly. No answers were received, except that defendant ordered out three shipments of flour thereafter. On June 1, 1929, plaintiff exercised its contract right to terminate the contract.

Defendant undertakes to meet this formidable evidence in several ways. He contends that he wrote plaintiff on July 31, 1928, saying he had not received any confirmation, and asking whether it was going to confirm. It is doubtful if this letter was admitted in evidence, for the stenographer's report of the trial does not so disclose; if admitted, it should not have been, for there was no proof of mailing. But it is immaterial; the proof is undisputed that no such letter was received, and if received, it would have no evidentiary bearing on the proof of confirmation as above narrated. He further testified that about the middle of August Mr. Brooks, the salesman, told him that "headquarters he don't confirm the contract because he don't want you speculating." In passing it may be observed that Brooks, a witness for defendant, does not corroborate this. But, in any event, Brooks had no authority to make or cancel a contract. Before that alleged conversation, defendant had received the telegram of confirmation, and about that time had received flour on the contract; and after the conversation, defendant repeatedly ordered, received, and paid for flour under the contract.

In our opinion, this evidence presents no issue of fact for a jury. The defendant concedes his signature to the contract; concedes the receipt of the telegram of confirmation; concedes that over a period of eight months he ordered out flour and received it at the contract price, no matter what the current market was. The explanation offered by him is not pleaded, and, what is of more consequence, it is at variance with undisputed record evidence. In short, it will not wash. "When the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it." American Car & Foundry Co. v. Kindermann (C. C. A. 8) 216 F. 499, 502; Missouri, K. & T. Ry. Co. v. Collier (C. C. A. 8) 157 F. 347, cert. denied 209 U. S. 545, 28 S. Ct. 571, 52 L. Ed. 920; Woolworth Co. v. Davis (C. C. A. 10)

41 F.(2d) 342, 347; Kelly v. Jones, 290 Ill. 375, 125 N. E. 334, 8 A. L. R. 792, and annotation 796, 798. The plaintiff was entitled to a directed verdict.

As to the question of damages. The contract provides:

"If the buyer shall fail to furnish shipping instructions or packages as herein provided, the seller may (1) cancel the contract, or (2) terminate the contract, the buyer to pay to the seller as liquidated damages the sum of:

"(a) One-third of one cent (1/3¢) per day per barrel of flour from the date of sale to the date of termination as the expense of carrying, plus

"(b) Twenty cents (20¢) per barrel as the cost of selling, and

"(c) Plus or minus the amount of the difference between the market value of wheat on the date of sale and on the date of termination, times four and six-tenths (4.6) times the number of barrels of flour. This amount is to be added if the price of wheat is lower and subtracted if the price of wheat is higher upon the date of termination."

The trial court submitted to the jury the question of whether this provision was in violation of an Oklahoma statute which provides that, where "an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered." In this, we think, there was error. There was no evidence from which a jury might find that this contract was within that statute. The principal element of damage is based on the market value of the 4.6 bushels of wheat that it takes to make a barrel of flour. Flour is sold by salesmen, and a breached contract involves a loss of selling expense, and the evidence is uncontradicted that 20 cents a barrel is a fair approximation of that loss. Where a buyer is given the option to order out flour at any time during the contract period, either wheat or flour must be carried in stock to enable the seller to comply with its contract. That involves interest, taxes, insurance, unloading, storage and fumigation. The evidence is uncontradicted that ⅓ cents per day is a fair approximation of the carrying charge. If the parties are at liberty under the law to contract as to damages, the stipulation bears a reasonable relation to the probable damage for the breach. Kothe v. R. C. Taylor Trust, 280 U. S. 224, 50 S. Ct. 142, 74 L. Ed. 382.

Counsel for defendant justify the charge under sections 5068 and 5069, C. O. S. 1921, which prohibit stipulations as to damages, except "when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage." Counsel state that this statute is a codification of the common law, and argue that the damage is readily ascertainable and is the difference between the contract price and the market value of the flour at the time and place of delivery. If the commodity sold was wheat or oil, for which there is a ready market, and if the contract called for delivery at a specified time, the argument would be sound. But that is not the contract. The contract was one to manufacture and deliver flour at the buyer's option as to time, within a period of ten months. Nor does the record disclose any exchange for flour sales, such as the Boards of Trade maintain for wheat; on the contrary, it shows that a market for flour must be searched for, and that salesmen are employed for that purpose. There is an overhead charge in maintaining a manufacturing plant in order to be ready to furnish particular brands of flour at any time within ten months. The plaintiff is not a broker; it is a manufacturer, and the rule suggested by defendant is not an adequate measure for the actual damage. Erie Baking Co. v. Hubbard Milling Co. (C. C. A. 3) 217 F. 759. Without detailing the evidence, which is uncontradicted, we are entirely satisfied that the record brings this case within the precise words of the statute—that it is "impracticable or extremely difficult to fix the actual damage," as well as within the authorities hereafter cited. Similar provisions in contracts for the manufacture and sale of flour have been many times sustained. Yerxa, Andrews & Thurston v. Randazzo Macaroni Mfg. Co., 315 Mo. 927, 288 S. W. 20; Sheffield-King Milling Co. v. Jacobs, 170 Wis. 389, 175 N. W. 796; Sheffield King Milling Co. v. Domestic Science Baking Co., 95 Ohio St. 180, 115 N. E. 1014; International Milling Co. v. Reierson et al. (S. D.) 225 N. W. 218; New Prague Flouring Mill Co. v. Hewett Grain & Provision Co., 226 Mich. 35, 196 N. W. 890; H. H. King Flour Mills Co. v. Bay City Baking Co., 240 Mich. 79, 214 N. W. 973.

Furthermore, there is a distinct trend toward a relaxation of the rules as to liquidated damages. Courts have always abhorred penalties, and have looked closely to see that penalties were not masquerading as liquidated damages. And if the stipulation is in fact a penalty—if it bears no fair relation to

[redacted]

the damage contemplated—it will not be enforced, no matter what it may be called. And if there is available an accurate and readily ascertainable method of fixing the damages, courts will assess the damages accordingly. In the complexities of modern business, breaches of contract involve more incidental but real damage than when business was less complicated; in later years, business men and associations of business men have been more desirous of contracting as to damage, in order that their liability may be a known rather than an unknown quantity. Responding to these changing conditions in the business world, the courts have been much less reluctant than formerly to enforce provisions for liquidated damage.

In Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 22 S. Ct. 240, 253, 46 L. Ed. 366, decided in 1902, the Supreme Court made a comprehensive survey of the decisions as to provisions for liquidated damage and held that such provisions were valid, where fairly entered into, where the damages sustained are "uncertain in amount." In 1907 the Supreme Court upheld a contract providing for damage of $35 a day for delay in the manufacture of each gun carriage, although the contract designated it as a "penalty." The court said: "The courts at one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be recovered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount, stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained." United States v. Bethlehem Steel Co., 205 U. S. 105, 119, 27 S. Ct. 450, 455, 51 L. Ed. 731.

The Supreme Court again reviewed the question in 1919, in Wise v. United States, 249 U. S. 361, 365, 39 S. Ct. 303, 304, 63 L. Ed. 647, and held:

"The subject of the interpretation of provisions for liquidated damages in contracts, as contradistinguished from such as provide for penalties, was elaborately and comprehensively considered by this court in Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 22 S. Ct. 240, 46 L. Ed. 366, applied in United States v. Bethlehem Steel Co., 205 U. S. 105, 27 S. Ct. 450, 51 L. Ed. 731, and the result of the modern decisions was determined to be that in such cases courts will endeavor, by a construction of the agreement which the parties have made, to ascertain what their intention was when they inserted such a stipulation for payment, of a designated sum or upon a designated basis, for a breach of a covenant of their contract, precisely as they seek for the intention of the parties in other respects. When that intention is clearly ascertainable from the writing, effect will be given to the provision, as freely as to any other, where the damages are uncertain in nature or amount or are difficult of ascertainment or where the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression. There is no sound reason why persons competent and free to contract may not agree upon this subject as fully as upon any other, or why their agreement, when fairly and understandingly entered into with a view to just compensation for the anticipated loss, should not be enforced.

"There are, no doubt, decided cases which tend to support the contention advanced by appellant, but these decisions were, for the most part, rendered at a time when courts were disposed to look upon such provisions in contracts with disfavor and to construe them strictly, if not astutely, in order that damages, even though termed liquidated, might be treated as penalties, so that only such loss as could be definitely proved could be recovered. The later rule, however, is to look with candor, if not with favor, upon such provisions in contracts when deliberately entered into between parties who have equality of opportunity for understanding and insisting upon their rights, as promoting prompt performance of contracts and because adjusting in advance, and amicably, matters the settlement of which through courts would often involve difficulty, uncertainty, delay and expense."

From these controlling authorities, the conclusion is clear that the contract is valid and enforceable. There being no dispute as to amount of flour which the defendant refused to accept, nor any dispute as to the computation, it follows that the trial court should have directed a verdict in favor of the plaintiff for the amount sued for.

[redacted] Other assignments of error are argued, but, in view of this disposition of the case,

156

need not be considered. More than half of the printed record, and a part of the briefs, is devoted to a controversy over the settlement of the bill of exceptions, and the trial held on that settlement. Little need be said. A bill of exceptions is, of course, a vehicle for bringing onto the record certain proceedings at the trial. If it did not happen at the trial, it does not belong in the bill of exceptions. Where the trial is reported by a competent stenographer, there should be little argument over what actually happened. Errors will occur, however, and if the stenographer has omitted something that did take place, or incorrectly reported it, the trial court should correct the omission, generally after notice to counsel. Since the appellate court does not have ready access to the trial transcript, it is helpful to us if such additions to the transcript are indicated as such in the bill of exceptions, as was done in this case. In the controversy here presented, the question of whether the stenographer correctly reported the trial, as plaintiff contends, or whether there were important omissions, as the trial court found, is not material and need not therefore be determined.

The judgment is reversed for further proceedings in conformity with this opinion.

Reversed.