## WOODMEN OF THE WORLD v. SUGAR.

### No. 1770.

Circuit Court of Appeals, Tenth Circuit.
March 3, 1939.

Dan B. Shields, of Salt Lake City, Utah (John L. Schweigert, of Denver, Colo., on the brief), for appellant.

Royal J. Douglas, of Ogden, Utah, for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

This was a suit to recover on a policy of life insurance and a supplemental contract of double indemnity which bound the company to pay twice the face amount of the policy in the event the insured should suffer loss of life as the direct result of bodily injury, effected solely through external violent, and accidental means. The insured died of gunshot wound about forty days after the issuance of the policy, and the issue joined in the court below was whether he was murdered or committed suicide. The court submitted that issue to the jury under instructions to which no exceptions were taken, and the jury returned a verdict for plaintiff for the full amount fixed in the double indemnity provision. But the contract for double indemnity provided that it should not apply if the death of the insured resulted from homicide. In view of that provision, the court indicated that a new trial would be granted unless plaintiff consented to a reduction of fifty per cent in the amount thus fixed in the verdict. Plaintiff consented; judgment was entered for the reduced amount; and defendant appealed.

The only contention relied upon for reversal of the judgment is that there was no substantial evidence to support the verdict. Stated otherwise, the argument is that the evidence showed suicide. A brief review of the evidence is essential. Evidence was submitted which tended to show these facts. The wife of insured—plaintiff in this action—owned a furniture store in Ogden, Utah. Insured worked in the store at a salary of $150 per month. He carried nine policies of insurance on his life in addition to the one in suit. They aggregated $42,000. Seven of them aggregating $22,000 had been in force more than a year while the remaining two aggregating $20,000 had been in effect less than seven months. He made application for three other policies which the companies refused to issue—one in 1936 for $10,000, one a few months prior to his death for $5,000, and one in February, 1937, for $5,000. And only three days before his death he asked the agent who sold him the policy in suit when he would be in Ogden again. The agent replied that he would be there the following Tuesday. Insured stated he would like to have the agent come and see him; that he was going to build an apartment house and wanted $5,000 of insurance, possibly $2,000. In another conversation had with the agent on the same day, insured stated that he had dreamed he was held up and shot.

Insured left his residence on Sunday morning at about 10 o'clock and went to the store. He called the assistant manager of a nearby store in respect to a tent for sale to one of his customers. He had secured a black 38 caliber pistol from the nearby store about the middle of the preceding week for sale to a prospective customer. He went to the store soon after the telephone conversation and got the tent and a nickel-plated 38 caliber pistol.

He stated that the black pistol previously obtained was too expensive for his prospective customer; that he was going to sell the tent and the nickel-plated pistol to the customer; and that the customer was coming that morning to look at them. When departing with the tent and the nickel-plated pistol, he said that he had better go as his customer might be waiting for him. There were no cartridges in either pistol at the time insured got them from the nearby store, and none was furnished with them. The body of insured was found in the office in the store between 1 and 2 o'clock in the afternoon with a pistol wound in the left side of the chest. The bullet passed through the body at an angle of thirty degrees upward, and lodged under the skin at the back of the left arm. The body was lying on its back and the knees were spread out a little and buckled up. The feet and knees were near a counter at one side of the office. The black pistol was lying on the counter. A discharged shell was in one chamber of the cylinder, but the other chambers were empty. On the counter near the pistol there was a dark spot which looked and smelled like a powder-burn. The tent was on the floor. The door to the safe was open. The drawers in the safe were pulled out. Some papers in the drawers were standing up and disordered. Two tin cash boxes which had been opened were on the floor. One contained some papers which were disarranged. Other papers were on the floor near the cash boxes. Insured's wallet was on the floor. Identification cards and other papers taken from it were strewn around, and two of the pockets to his trousers were turned inside out. Between $150 and $250 had been placed in the safe at the close of business Saturday night, but none of it was found. The cash register showed $43.35 rung up, its cash drawer was open, and no money was found in it. A bank book, and a check and deposit slip for the same amount were lying beside the cash register. The front door of the store was unlocked, and the rear door was open two or three feet. The counter on which the pistol was lying was slightly more than forty-two inches high. Insured was sixty-one and one-half inches in height, and the distance from the soles of his shoes to the point at which the bullet

entered the chest was forty-six and one-half inches. Soon after 1 o'clock, a man and his wife residing approximately one hundred and fifty yards from the store saw insured come out of the rear door, look around, and then go back inside. The wife suggested to her husband that insured had a sale. A few minutes later they saw a stranger come out the same door, look around, and then go northward. He "hopped up and went on a dog-trot * * * just cantering along * * * just going kind of fast * * * was going quite fast." A neighbor came to the home of the husband and wife about fifteen minutes later and told them that insured had been shot and was dead. It was a month or more before they told the officers or anyone else that they had seen the stranger. The wife of insured owned their home in Ogden, and another home in a canyon, and they were building an apartment house at the time he met his death. Other facts were shown but this resume is enough. No evidence was submitted which indicated even remotely domestic trouble, financial distress, or any other motive for suicide.

■ It would not serve any useful purpose to undertake an extended analysis of the evidence or the conclusions which may reasonably be drawn from the facts and circumstances. It is enough to say that some of the facts and circumstances point with persuasion to suicide while others argue strongly that insured was murdered with robbery as the motive. There is tenable basis for either conclusion. But conflicts in evidence are for the jury.

■ An appellate court does not weigh evidence or resolve conflicts in it. It merely determines whether substantial evidence was adduced to support the verdict. F. W. Woolworth Co. v. Davis, 10 Cir., 41 F.2d 342; Larabee Flour Mills Co. v. Carignano, 10 Cir., 49 F.2d 151; Frates v. Thomas, 10 Cir., 57 F.2d 535; Hammond v. Tate, 10 Cir., 83 F.2d 69, 105 A. L.R. 433; Penn Mut. Life Ins. Co. v. Tilton, 10 Cir., 84 F.2d 10. Despite the countervailing evidence, the verdict is supported by substantial evidence and is not open to the challenge directed against it.

Affirmed.