COLORADO COAL FURNACE DISTRIBUTORS, INC., a Colorado Corporation, Plaintiff-Appellant/Cross-Appellee,

v.

PRILL MANUFACTURING COMPANY, a Wyoming Corporation, Defendant-Appellee/Cross-Appellant,

v.

Jack STEELE, Don Steele, Steel T Heating Inc., and Colorado Coal Distributors, Inc., a Colorado Corporation, Counter-Defendants/Appellees.

Nos. 77–1222, 77–1223.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 25, 1978.

Decided Aug. 7, 1979.

Larry Lawton of Guy, Williams & White, Cheyenne, Wyo., for plaintiff-appellant/cross-appellee and counter-defendants/appellees.

Henry A. Burgess, Burgess & Davis, Sheridan Wyo., submitted a brief for defendant-appellee/cross-appellant.

Before McKAY, LEWIS and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from a suit for breach of contract brought by Colorado Coal Furnace Distributors, Inc. (Colorado Coal) against the Prill Manufacturing Company (Prill) when Prill cancelled an exclusive distributorship contract for coal furnaces it manufactured. A jury awarded Colorado Coal $76,644.18 monetary damages, less $18,985.74 it owed to Prill. Prill's motion for judgment n. o. v. was denied. Colorado Coal appeals the trial court's dismissal of its request for specific performance and injunctive relief. Prill cross-appeals the unfavorable jury verdict. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

The parties raise numerous issues on appeal. Prill argues it did not breach the distributorship agreement and Colorado Coal did not suffer any damages from Prill's cancellation of the exclusive distributorship. Prill also claims Colorado Coal of-

ficers misused corporate funds, and that no capital was contributed to that corporation, thereby making the officer-shareholders personally liable for account balances owed to Prill. Colorado Coal argues the trial court improperly denied its claim for injunctive relief and specific performance, and improperly refused to reserve its equitable claims for a hearing after the jury trial.

Prill has operated a coal furnace manufacturing plant in Sheridan, Wyoming since 1972, and entered into a distributorship agreement June 12, 1975, with Jack Steele on behalf of Colorado Coal, which was incorporated the next day to operate the distributorship. Jack and his brother Don had procured orders for the furnaces prior to the execution of the agreement, and Prill's accounts show invoices as early as May 12, 1975. These contracts and the accounts payable were apparently transferred to Colorado Coal after incorporation.

Various provisions in the agreement are pertinent to our discussion. Colorado Coal was required to pay for all purchases within 30 days after receiving an invoice. The corporation was granted the exclusive right to sell Prill products in Colorado, and a subsequent amendment extended the distributorship to Kansas, Nebraska, North Dakota, South Dakota and Oklahoma. Colorado Coal was also to receive credit for certain specified advertising expenses. Prill agreed to provide service manuals for its products, literature and advertising materials. The amendment also set a five year term for the agreement provided specified numbers of furnaces and stokers were sold; the agreement would automatically terminate if such goals were not met.

During the existence of the distributorship, the parties had two continuing problems: payment by Colorado Coal on its account, and Prill's obtaining International Conference of Building Officials' (ICBO) approval for the furnaces. An issue at trial was whether the 30-day payment requirement was waived or altered. Some of the evidence is discussed below.

Regarding the ICBO sanction, apparently most metropolitan area building codes require ICBO approval of furnaces before an installation permit will issue. Evidence at trial treated the importance of ICBO approval as a prerequisite to wide distribution of the furnaces and stokers. There was evidence the Steele brothers had knowledge, prior to signing the agreement, that either ICBO or some other approval had not been obtained, but they claimed to have received assurances that any necessary approvals would be forthcoming. Exhibits for Colorado Coal show orders were cancelled due to the absence of ICBO approval. Colorado Coal asserted it withheld payment from Prill because of Prill's delay in obtaining that approval. There was dispute to what extent the delay was reasonably attributable to ICBO testing procedures or to Prill.

Prill terminated the distributorship on November 5, 1975. Colorado Coal then instituted this suit. The breach of contract claim was tried to a six-person jury on special interrogatories. It found a valid contract, breached by Prill with damages of $76,644.18 subject to a setoff of $18,985.74 on the accounts payable to Prill. The jury found no misapplication or willful misappropriation of Colorado Coal assets by the Steeles. The court on its own motion dismissed with prejudice, without findings, Colorado Coal's claims for injunctive relief and specific performance, as is more fully discussed below.

I

■. Prill raises several issues on appeal which are intertwined with and require review of the jury instructions. The challenged instructions deal with finding a contract breach, proving damages, and whether delay attributable to governmental regulation is an excuse for nonperformance of a contract. As a general rule, a jury verdict will be upheld unless it is clearly erroneous, or there is a lack of evidence to support the verdict. *Lavender v. Kurn*, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946); *Woodmen of the World v. Sugar*, 102 F.2d 695 (10th Cir. 1939).

As to the instructions for finding a contract breach, Prill raises two specific questions. Prill asserts it had a legal right to cancel the contract because of Colorado Coal's nonperformance under the 30-day payment provision. It also argues Colorado Coal's failure to comply with the payment schedule precludes assertion of a claim for breach of contract against Prill.

■ The instruction given did not specifically state that Colorado Coal had, under the terms of the agreement, 30 days to pay an invoice. However, it refers specifically to the failure to pay "within the time agreed to by the parties in the franchise agreement or within an additional time as you [the jury] may find the parties agreed upon." The evidence showed Colorado Coal was having trouble making payments to Prill, blaming the lack of ICBO approval of the furnace for at least part of the difficulties. A letter from Prill dated July 31, 1975 mentions the problems, telling Colorado Coal, "You must get your financing taken care of." It also states, however, "We [Prill] will extend credit by the amount of bank committed monies. Example—100m bank 25m PMC Total—125,000.00." While it reiterates that all accounts are to be paid 30 days from the date of the invoice, it states a "temporary line of credit $25,-000.00, will be used at this time." Testimony offered by Colorado Coal was in conflict with that of Prill on the meaning of the letter and other communications between the parties. But there was evidence which, if believed, would support a jury finding of a modification of the requirement to make payment within 30 days, if as was the case after August 4, 1975, the debt owed Prill did not exceed $25,000.00. The jury was instructed that a subsequent mutual agreement could alter a written contract. The jury was permitted to find either that Colorado Coal was bound by a 30-day payment schedule or by another arrangement. No errors exist in this portion of the instructions. *See Snowball v. Maney Bros. & Co.*, 39 Wyo. 84, 270 P. 167, *op. on rehearing*, 39 Wyo. 84, 271 P. 875 (1928).

Prill's other objection to instructions on contract breach concerns the general rule that a party unable to perform may not seek performance from the other party to the contract. *McHale v. Goshen Ditch Co.*, 49 Wyo. 100, 52 P.2d 678 (1935). Prill tendered an instruction which would have required Colorado Coal show compliance with the 30-day payment provision in the original agreement before recovery on its damage claim would be allowed. Prill focuses on Colorado Coal's failure to pay within 30 days as the only nonperformance justifying Prill's cancellation of the agreement. This instruction makes no allowance for a later modification of the payment schedule, as discussed above. It does not account for testimony that Colorado Coal offered Prill about $25,000 on its account at a meeting on July 12, 1975, but Prill permitted Colorado Coal to use the money instead toward expansion of its sales force.

■ The instructions given included a statement permitting the jury to find for Prill if it determined Prill was within its rights to cancel the agreement due to Colorado Coal's non-payment. Those instructions, in effect, required the jury to determine who committed the first substantial breach. We find no error in the instructions because they permitted the jury to make factual findings raised by the evidence presented at trial concerning when Colorado Coal was required to pay invoices and what might constitute a breach by either party.

■ Prill objected to the jury instructions concerning the delay in obtaining ICBO approval. Prill offered instructions that the delay would not excuse Colorado Coal from performing under the agreement, and that a party may not be excused from performance due to voluntarily discontinuing his business or encountering financial difficulties. Instead, the judge charged the jurors:

in order for the plaintiff [Colorado Coal] . . . to recover . . . you must find that the defendant [Prill] promised either expressly or by implication to obtain approval for the operation of its

equipment from the appropriate boards and governmental agencies; . . .

The court thus allowed the jury to determine whether obtaining ICBO approval was a constructive condition to Colorado Coal's performance. Testimony at trial, and the minimum sales quotas in the agreement, indicate the parties anticipated widespread distributions which would only be possible if markets were available in metropolitan areas.

An obligation may be implied when no other interpretation is reasonable. Since only a manufacturer can apply for and receive ICBO approval, it is reasonable to find Prill assumed that burden. *Richardson v. Homestake Mining Co.*, 322 F.2d 329, 331 (10th Cir. 1963) declared:

> It is a general rule of wide acceptance that rights and obligations of parties under a written agreement sometimes exist even though not expressed therein. Sometimes such rights and obligations find their genesis in facts and circumstances which intervened after the execution of the writing, and sometimes they rest upon other footing. But it must appear with reasonable certainty that rights or obligations of that kind are necessary to carry into effect the intention of the contracting parties.

*See also Arch Sellery, Inc. v. Simpson*, 360 P.2d 911 (Wyo.1961) ("evidence regarding the custom, usage, and practice in the building industry was admissible to interpret the meaning of the contract between the parties").

The trial court did not commit error permitting the jury to find, in light of the surrounding circumstances, that Prill had an obligation to insure marketability of its products.

Prill also argues that Wyo.Stat. § 34–21–278(a)(i) excuses a seller from performance under a contract when unforeseeable supervening circumstances arise. That statute, however, is not applicable. Lack of ICBO approval did not affect Prill's delivery schedule, it impaired Colorado Coal, as the buyer, from reselling furnaces and setting up distributorships. ICBO approval was eventually obtained in March, 1976. At worst there was only temporary impossibility, which under prevailing case law creates a temporary excuse for nonperformance of contractual obligations. Temporary impossibility is not grounds for cancellation of a contract. The obligation to perform is revived when performance subsequently is possible. *See generally* 84 A.L.R.2d 12, 67 (1962); Restatement of Contracts § 462 (1932). Thus Prill's own failure to obtain ICBO approval did not permit it to cancel the distributorship agreement. We find no error in the court's handling of the ICBO issue.

Prill's final objection relates to the jury's determination of damages. We must hold that, absent clear error, the jury's findings are to be upheld if they were properly charged as to the applicable law, and are not shown to be influenced by partiality, passion or prejudice. *L.E. Whitham Constr. Co. v. Remer*, 105 F.2d 371 (10th Cir. 1939); *State Highway Comm'n v. Peters*, 416 P.2d 390 (Wyo.1966). In this instance, the instructions must accurately state the law of measuring lost profits for a new business.

Wyoming law was most recently stated in *Wyoming Bancorporation v. Bonham*, 563 P.2d 1382, 1385, *rehearing denied*, 566 P.2d 219 (Wyo.1977). That case adopts a statement in 25 C.J.S. *Damages* § 42b (1966), quoted in the opinion, stating a rule consistent with the instructions given to the jury here. The focus is not on classifying a business as new or established for purposes of assessing lost profits, but rather on finding a factual basis for computing actual damages with "reasonable certainty." The judge's charge to the jury that

> the law will not permit damages to be awarded for loss of profits if the claim for them is based upon uncertainty, contingencies, speculation, guesswork or conjecture

is consistent with the approach in *Bancorporation*.

At trial Colorado Coal presented four alternative methods for computing damages, each of which would have result-

ed in damages greatly in excess of the amount awarded by the jury. But we cannot say the jury was clearly erroneous simply because it reached a figure less than half that of Colorado Coal's lowest proposed damage figure, absent some showing the jury was influenced by passion, prejudice or bias. *State Highway Comm'n v. Peters, supra.*

Prill made several objections at trial to the introduction of evidence admitted to prove damages. In its appeal Prill focuses on whether the criteria for admissibility were met. Under applicable law there must be documentary proof to support testimony offered to prove lost profits. *Board of County Comm'rs v. William J. Howard, Inc.*, 230 F.2d 561 (10th Cir.), *cert. denied*, 351 U.S. 926, 76 S.Ct. 784, 100 L.Ed. 1456 (1956). Testimony and exhibits offered by Colorado Coal were admitted, but the corporate books and records upon which those exhibits were based were not presented at trial. As a general rule, if a summary of books and records is admitted into evidence, the actual documents forming the foundation for the testimony must be made available to the opposing party, if not also the court. *Id.* There is evidence Colorado Coal did not have a formal set of accounting records. Cox, the accountant who testified for Prill, evidently had access to the same information that Colorado Coal's witnesses used as the basis of their testimony. When Colorado Coal complied with a pretrial production of documents order, Prill was given access to all the information Colorado Coal later used for the formulation of its various damage theories.

Under these circumstances we cannot say the general rule concerning admitting summary testimony was violated. Both parties had the same data, but interpreted it differently. That Colorado Coal may have created a set of books based on the same data they submitted to Prill does not change the result. Prill had, and took advantage of, its opportunity to cross-examine and impeach testimony offered by Colorado Coal on the financial future of the company. There was data before the jury showing in detail all of the income and expenses of Colorado Coal covering the period at issue. Significant evidence was produced on orders received, cancelled and in prospect. Necessarily, there was some uncertainty as to how many furnaces might have been sold if the ICBO approval had been obtained and Colorado Coal had been allowed to operate. The jury did not agree with the optimistic projections of Colorado Coal, but nevertheless found damages were incurred by that company.

The jury's damage award is affirmed. We need not, therefore, discuss misuse of corporate form or company funds, and whether the Steele brothers should be personally liable on the accounts payable to Prill, as these become moot points.

## II

Colorado Coal raises several related issues concerning its request for equitable relief. In its complaint Colorado Coal sought, in addition to monetary damages, an injunction against Prill's termination of the agreement and specific performance of that contract. Colorado Coal argues: the equitable claims should have been reserved for hearing after determination of the legal claim for damages; the judge should not have decided the issues without notice and a hearing; and the trial court should have entered findings of fact and conclusions of law supporting the denial of relief.

We agree with Colorado Coal that as a general rule equitable claims are considered subsequent to decision on legal claims. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Chapman v. Kleindienst*, 507 F.2d 1246, 1253 (7th Cir. 1974). This case was decided after the trial of the legal claim. After the jury verdict, the trial court on its own motion dismissed Colorado Coal's equitable claims with prejudice, without stating findings or reasons for the dismissal, but declaring that he had "considered the evidence offered at the trial."

During trial, Colorado Coal evidently was operating on the assumption a

second hearing would decide its equitable claims. It therefore made a motion for a new trial after its claims were dismissed. There was a lengthy colloquy between its counsel and the court on this question. Counsel told the court Colorado Coal intended to present evidence on what the company had been doing in states other than Colorado. The court expressed its understanding that it was to decide on the evidence already presented at the trial. Then the following discussion took place:

THE COURT: Well, now, the third claim for relief is that the Defendant has refused to ship stoker furnaces or broilers or other items since November 3rd, has refused to perform the dealership, and that the Plaintiff has performed and will perform each portion of the agreement. Don't you think that all the evidence on that issue is before the Court?

MR. LAWTON: Your Honor, just off the top of my head on that third claim, I honestly can't think of any additional evidence we want to present.

THE COURT: You ask for specific performance.

MR. LAWTON: That's right. But what we really want out of this, your Honor, is the right to distribute the furnaces for the five-year life of the contract. I hadn't really gotten to the main thrust of my argument.

.       .       .       .       .

Now, I can't recall a scintilla of evidence as to what our profit would be after September 15, 1976, on a contract that was, by its terms, to last for five years.

That being the case, it seems to me we just haven't had a hearing on that point. We were entitled to have a hearing on what we could have done.

It could be that all the evidence was presented, your Honor.

.       .       .       .       .

THE COURT: Well, I am going to do this: As to the third claim for relief, I am going to deny your motion for a new trial because you have stated that there weren't any facts that you could have produced.

MR. LAWTON: I can't fight that.

THE COURT: As to the second claim for relief, I am going to give you a period of—is five days sufficient to file with me a detailed statement of the facts that you would have to produce in a subsequent and second bifurcated hearing on the second claim? I want to see with specificity the evidence that could be produced on that.

I think, in any event, I am going to not grant your motion. I am sure that the Court of Appeals would want to know exactly what it was you had to produce, so I think it should be in the record.

The trial judge eventually granted Colorado Coal 30 days to present a detailed statement of facts supporting specific performance. On January 20, 1977, the court formally denied Colorado Coal's motion for a new trial on the claims for injunctive relief and specific performance, "the plaintiff having not submitted any additional information on this matter to the Court."

In its brief on appeal Colorado Coal points only to a "Brief Supporting Plaintiff's Motion for New Trial on Plaintiff's Second and Third Claims for Relief," filed December 6, 1976, and the following excerpt from that document, as its response to the court's order for a detailed statement of facts in support of its claim:

The testimony of Roger Olson, formerly the Defendant's Vice-President in charge of marketing, would have been most helpful at trial, but even more helpful in determining injunctive relief. Mr. Olson could well be the person (other than the parties to the law suit) who would be in the best position to tell what efforts were made by the Plaintiff to expand its marketing efforts into other areas.

In summary, the Plaintiff would present, in addition to other evidence, the following at an evidentiary hearing on injunctive relief:

1. Hopefully, the testimony of Roger Olson (Plaintiff is still trying to contact Mr. Olson, and has at least gotten as close as talking to his wife).

2. Advertisements, response coupons, and other sales efforts expended in the states outside Colorado.

3. Information obtained from the Defendant via interrogatories regarding distribution in areas granted exclusively to the Plaintiff.

The rules of notice and hearing, applicable to preliminary injunctions, would not be applicable here, since this was a decision made after trial. Colorado Coal did not present a detailed statement of facts supporting its claim for specific performance which would justify a special hearing or trial. Nevertheless, it is obvious the trial court denied the equitable claims on their merits. Its last order was simply with respect to the motion for new trial on the equitable claims.

Fed.R.Civ.P. 52(a) requires findings of fact and conclusions of law in all matters tried without a jury. While there was a jury trial here, the equitable claims were reserved and the court entered a judgment of dismissal with prejudice, in its words, "having considered the evidence offered at the trial." In such a case Fed.R.Civ.P. 41(b) is applicable. "If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)." There are none here.

Prill argues that such failure is harmless error, as has been held where the basis of the decision is evident from the record. *E. g., Huard-Steinheiser, Inc. v. Henry,* 280 F.2d 79 (6th Cir. 1960).

In this case the jury found for Colorado Coal on its breach of contract claim. Colorado Coal argues it presented evidence of its damages only to the time of suit, because it hoped to receive reinstatement of the contract—specific performance—with respect to the remaining term. We can speculate on the various possible reasons the trial court denied injunctive relief and specific performance. But the basis of its denial is not evident from the record.

The purpose of Rule 52(a), as it is applied to a nonjury case, is usually stated to be three-fold: (1) to aid the appellate court by affording it a clear understanding of the ground or the basis of the decision of the trial court; (2) to make definite just what is decided by the case to enable the application of *res judicata* and estoppel principles to subsequent decisions; and (3) to evoke care on the part of the trial judge in ascertaining the facts. . . .
*Leighton v. One William Street Fund, Inc.,* 343 F.2d 565, 567 (2d Cir. 1965). We must remand the case on this issue with instructions to make findings of fact and conclusions of law which will afford us an understanding of the basis of the trial court's decision.

For the reasons stated we affirm the judgment on the breach of contract count and the damages award made thereon, but we remand for findings of fact and conclusions of law on the equitable claims.